IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1)PINNACLE PACKAGING COMPANY, INC., an Oklahoma corporation, 2) POLO ROAD LEASING, LLC, an Oklahoma limited liability company, and 3) J. SCOTT DICKMAN,<br><br>Plaintiffs,<br><br>vs.<br><br>4) ONE EQUITY PARTNERS LLC, a Delaware limited liability company, and 5) CONSTANTIA FLEXIBLES GmbH, an Austrian corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 12-CV-537-JED-TLW |

---

**SURREPLY TO DEFENDANTS ONE EQUITY PARTNERS LLC,
ONE EQUITY PARTNERS (EUROPE) GMBH, AND CONSTANTIA FLEXIBLES
GMBH'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

---

Laurence L. Pinkerton, OBA #7168
Pinkerton & Finn, P.C.
Penthouse Suite
15 East 5th Street
Tulsa, Oklahoma 74103-4303
Tele: 918-587-1800
Fax:  918-582-2900
ATTORNEY FOR PLAINTIFFS

November 25, 2013

Plaintiffs, Pinnacle Packaging Company, Inc., Polo Road Leasing, LLC, and J. Scott Dickman, hereby file their Surreply to Defendants One Equity Partners LLC, One Equity Partners (Europe) GmbH, and Constantia Flexibles GmbH's Reply in Support of Their Motion to Dismiss (the "Surreply).

## I.  SURREPLY TO NEW ARGUMENTS AND/OR "FACTS" ON JURISDICTION.

1.     Defendants argue a new "fact" that Plaintiffs seek to amend their Complaint. Reply 1. Each of the three argued grounds fail:  (1) The elements of conspiracy are well pleaded in the Complaint.  (2) The absence of terms for the Wells Refinancing was not a pleading failure, rather, Defendants refused to submit them. ¶ 39.  (3) The additional $3 million fraud damage amount is subsumed within "no less than $18 million," ¶ 56, and Plaintiffs have shown the plausibility of their claim.  Response 44 at fn. 17.

2.     Defendants argue for the first time[1] in Defendants One Equity Partners LLC, One Equity Partners (Europe) GmbH, and Constantia Flexibles GmbH's Reply in Support of their Motion to Dismiss [DKT 62] (the "Reply"):

> Finally, Plaintiffs' story – that Defendants sabotaged Plaintiffs' possible deal with Centre Lane using the fraudulent promise of a better deal it never intended to perform, *then lent $3 million to Plaintiffs and risk losing that money to Plaintiffs' creditor Wells* – is completely implausible.

Reply 1-2.[2]  Plaintiffs' position is not implausible.  Rather, it shows the hubris with which the

---

[1]  In this Surreply, the Plaintiffs, in the text or footnotes, show how new argument or new "facts" in the Reply should have been set forth in the Motion.  This is done to rebut any potential argument that Defendants are entitled to a response to this Surreply.

[2]  This new argument should have been made in Defendants One Equity Partners LLC, One Equity Partners (Europe) GmbH, and Constantia Flexibles GmbH's Motion to Dismiss and Brief in Support (the "Motion"), as the Amended Complaint states:

> Had Defendants (directly by management or indirectly through counsel or Blaige) given Pinnacle so much as an inkling that Defendants would embark on this quixotic scheme with regard to the Wells debt – let along renege on its promises to Pinnacle because its quest did not succeed – Pinnacle would not have executed the Settlement Agreement.

international financiers, Unger and von Hugo, treated the Oklahoma company, Pinnacle, and its CEO, Dickman.  It is entirely plausible that while representing to them that the Wells Debt would be taken out, the Defendants, and in particular, von Hugo, thought a better financial deal could be made with Wells, and that's what was attempted, without success.  ¶¶ 39-40.  The Summary at p. 33 presents Dickman's sworn recollection of von Hugo's statements to him on July 31, 2013 after von Hugo had spoken to Wells and made the $1 million offer:

> Chris told Scott Dickman it's not like we are some small finance group.  We are the investment arm of JP Morgan and could buy Wells three times if it wanted to.  They should be more respectful and at least try to be rational.  He also said he was in a position to bring a lot of business to Wells and he was surprised he was not received more openly.

This display of bravado is equally consistent with Plaintiffs' position.

       3.      In the Motion, the Defendants make a conclusory statement that the Amended Complaint should be dismissed with prejudice, Motion 35, and that statement is repeated in the Reply.  However, in the Reply, the Defendants make the new argument that amendment should be denied because Plaintiffs "already have amended the Complaint once and further amendment would be futile."[3]  Reply 2 at fn. 2.  No authorities or argument are cited in support of either proposition, *i.e.*, that amendment under Rule 15(a)(1)(B) precludes further amendment, or why futility applies to an amendment to any particular claim.  No authority exists for the first proposition, and any argument concerning futility should have been raised in the Motion so that Plaintiffs could respond.  In the absence of any authority or factual demonstration, the Court should disregard the conclusory arguments.

       4.      Defendants first argue in Reply an incorrect "fact:"

---

¶ 40.  The same point appears in ¶ 45.  Defendants' new argument was invited by these allegations, but it does not appear in the Motion.

  [3]  This is a new argument.  In the Motion, the Defendants, in opposition to the Surreply brief, argue that the Amended Complaint should be dismissed with prejudice at p. 2, but the Motion never refers to their being a prior amendment or that an amendment would be futile.

> Plaintiffs have not pleaded that they relied to their detriment on von Hugo's alleged affiliation with OEP, LLC . . . *See Sparks Brothers Drilling Co. v. Texas Moran Expl. Co.*, 829 P.2d 951, 954 (1991) . . .

Reply 3.[4]  Plaintiffs have pleaded reliance on von Hugo's status to their detriment.  Plaintiffs expressly allege that they were informed that von Hugo was the "management partner of OEP (the private equity fund of JP Morgan)," and upon hearing that Dickman adverted to the Internet to ascertain exactly what that meant.  It otherwise is clear that this proposed acquisition was a multimillion dollar transaction which required a hefty player like "the private equity fund of JP Morgan."  Further, there is an express allegation that on July 24, 2012:

> Unger indicated that Constantia could not provide the loan financing, which would require its 'shareholder.'  From Unger's previous representation that Constantia was acquired by One Equity Partners, 'shareholder' was understood to be One Equity Partners.

¶ 34.  In other words, OEP was central to the transaction.  Further, by believing von Hugo's status and Defendants' promises and representations, the Plaintiffs went forward and concluded the Settlement with Centre Lane, where Plaintiffs' rights and prospective advantage were lost.  Obviously, there was reliance to Plaintiffs' detriment.[5]

     5.        The Defendants newly argue that the emails and citation of recorded material is not authenticated.  Reply 2, 4 at fn. 8, and 5.  Admissibility is not the test at this stage of proceedings.  Response, Section I.  Moreover, this argument is belied by specific statements in the Dickman Affidavit wherein Dickman states that he recorded the conversations (admissions), and that he has listened to the recordings that are quoted in the Response and Summary and he verifies the accuracy

---

[4]  This is a wholly new argument.  The word "detriment" does not appear in the Motion, and if there was a failure in the Amended Complaint of this character, the argument should have been made in the Motion.

[5]  The Defendants further introduce confusion concerning von Hugo by newly arguing in the Reply 3 at fn. 5 that, "'Plaintiffs' [had] actual knowledge that von Hugo was 'Partner, One Equity Partners Europe." *See Exhibit 2, P00230.*'"  This does not dispute that von Hugo was likewise a "managing director of OEP."  He could have dual positions.

of the quotations.  Dickman Affidavit, ¶ 5.  This authenticates the specific quotations that are set forth.  Moreover, Dickman made the recordings, and the emails were received, in the context of a business negotiation clearly making them business records of Pinnacle.

Finally, Defendants newly assert the illegality of the recordings.  This first occurs in footnote 8 concerning the recording of Blaige, and is premised on Blaige being in Illinois.  The quoted recording of Blaige was from the meeting in Houston, Texas, Response 6, and so Illinois law was not implicated.  Further, evidence lawfully obtained in accordance with federal law by recording a telephone conversation with consent of one of the parties is admissible in federal court even if the acquisition of such evidence violated state law.  *U.S. v. Smith*, 482 F.Supp. 825 (W.D.Okla. 1979).  Oklahoma law permits such recording.  *See* 21 O.S. § 1782.  Finally, the implication that Illinois (or German) law is applicable, has implicit in it a choice of law determination, which is wrong because of Oklahoma's interest in the matter.  *See Ball v. Ehliv*, 2005 WL 1023650, *167-168 (Pa.Com.Pl.).  Footnote 12 in the Reply further refers to the foreign law of Germany, yet, to argue such foreign law, it must be presented to the Court rather than a mere citation.  *See Tidewater Oil Co. v. Waller*, 302 F.2d 638, 641 (10th Cir. 1962).

6.     For the first time Defendants argue that Dickman's residence in Oklahoma is a "unilateral action," and they newly cite to *G&G Intl., LLC v. Camsing Co.*, 2010 WL 466812 (D.Co. 2010).  Reply 7.  *G&G* does not support the "unilateral" action claim.  Rather, in this new argument, Defendants distort Plaintiffs' allegations which are premised on the direct solicitation in Oklahoma of an Oklahoma corporation, Pinnacle, with its principal place of business in Oklahoma, through its CEO, Dickman, who resided in Oklahoma.  This is wholly different from *G&G*, where the forum was Colorado, the plaintiff was a Maryland corporation with its principal place of business in Colorado, and the contract between the parties focused entirely on Maryland.  *Id*. at *1.  The Defendants quote from *G&G* as follows:  "Nothing in the contract called for either party to perform

any particular functions in Colorado."   Here, performance occurred in Oklahoma through the effectuation of the Settlement with Centre Lane and would have occurred through the purchase in Oklahoma of the Oracle stock from Pinnacle and Dickman's consultation, or the receipt of alternative financing of the Wells Debt for Pinnacle and Dickman, both of whom were borrowers and guarantors on the Wells Debt.  ¶ 16; Dickman Affidavit ¶ 3.

Further, in *G&G* the court focused on the visit made by the representative of the defendant to the forum, Colorado, and determined the visit not to be significant because it did not relate "to either the formation or the alleged breach of the contract."  *Id.* at *3.  Here, the meeting in Tulsa, Oklahoma on July 20 with the Defendants' representative, Blaige, specifically was focused on the Settlement with Centre Lane, the Wells refinancing, and underlying all of that, the potential acquisition, *i.e.*, the formation and alleged breach.  ¶ 30.

7.      In the Motion the Defendants conclusorily state that "Oklahoma law would likely not govern the breach of oral contract or tort claims," but no choice of law analysis follows, though the Defendants observe that of the written agreements referenced in the Complaint, the Plaintiffs do not and cannot allege that any one of them is governed by Oklahoma law.  Motion 17, fn. 15; 19, fn. 7.  Because of the significance of the applicable law in the jurisdictional determination, Plaintiffs made a choice of law analysis and argued waiver by Defendants through their lack of analysis.  Response 25.  In the Reply, Defendants make a new argument supporting their position that Oklahoma law "likely" does not apply.  Reply 9 at fn. 24.  Defendants' argument is impotent.  First, it does not address the legal analysis set forth by the Plaintiffs in the response at pp. 20-22.  Second, the Defendants do not differentiate between the contract and tort allegations which require separate analysis.  Third, Defendants do not provide any substantive law in support of their argument.  Fourth, Defendants in their footnote wholly ignore the oral contract that is the essence of Plaintiffs' claims.  Defendants do argue that Oracle is located in North Carolina, but this, of course, ignores that Oracle was owned by an Oklahoma corporation with its principal place of business in Oklahoma, and that

the acquisition of Oracle would occur in Oklahoma, facts relied upon by the Plaintiffs in their choice of law analysis.

Next, in the footnote, the Defendants newly argue that, "Defendants allegedly made the oral agreement and authorize the $3 million payment to Centre Lane while in Europe." In fact, nothing is alleged as to where the Defendants were when the agreement was reached on July 25, 2012. ¶ 35. Again, Plaintiffs' choice of law analysis on the contract claim refutes this argument.

Finally, the Defendants modify their previous argument from the Motion and state, "Every potentially relevant contract is governed by a law other than Oklahoma." Reply 9 at fn. 24. This again ignores the oral contract that is the essence of Plaintiffs' claim, an oral agreement with Oklahoma corporations, Pinnacle and Polo Road, through negotiation with their CEO, an Oklahoma resident, which was to be performed in Oklahoma. In addition, Pinnacle and Dickman were both debtors and guarantors of the Wells Debt and the harm from the breach of the oral agreement and from the alleged torts was knowingly inflicted within the State of Oklahoma. ¶ 16; Dickman Affidavit ¶¶ 10 and 16.

8.  The Defendants newly argue that, "The Complaint identifies only two individuals affiliated with Plaintiffs who are in Oklahoma and are alleged to have had any significant involvement in the underlying transaction. . . ." Reply at 9. In fact, Lynnwood R. Moore, Jr., is specifically referred to on multiple occasions in the Complaint. ¶¶ 8, 38, and 39.

9.  After arguing the fair play and substantial justice jurisdictional issue under the fourth rubric of "Interstate Judicial System's Interest in Obtaining Efficient Resolution," in the Motion at 17, Defendants in the Reply argue for the first time and state a new and incorrect "fact" about the Response:

> Plaintiffs fail to address "where the wrong underlining the lawsuit occurred." *OMI Holdings*, 149 F.3d at 1097.

Reply 9. This quoted statement is extracted from *OMI*, which presents no further explanation, but cites in support of it *Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 148 (3d Cir. 1992). That

case affirms the argument made by Plaintiffs in their choice of law analysis for the tort claims that focused on acts from outside the State of Oklahoma causing harm within it, Response 21-22, and *Carteret* further states that given that the exercise of personal jurisdiction can arise from tortious acts committed outside the forum state and causing effects within the state, that the concept of the tortious act occurring within the forum state is of equal or more power. *Id.* Clearly, the Plaintiffs alleged the wrong occurred in Oklahoma. ¶¶ 1-3, 12, 16; Dickman Affidavit ¶¶ 4, 15, and 24.

10.     Despite arguing the fair play and substantial justice jurisdictional issue under the first rubric, "Burden on Defendant," in the Motion at 16, the Defendants argue in the Reply for the first time that:

> Other courts have held that Austrian courts are adequate alternative fora.  *In re Ski Train Fire in Kaprun, Austria*, 499 F.Supp.2d 437, 446-47 (S.D.N.Y. 2007).

Reply 10.  *In re Ski* is wholly distinguishable from the facts and law present here.  That case arose out of a train fire in Kaprun, Austria.  *Id.* at 439.  In its holding, the court specifically found that the defendants had offered "unrebutted evidence that Austria has an effective and efficient judicial system bolstering this court's own previous finding that Austria provides an adequate alternative forum for litigating disputes arising out of the Kaprun disaster."  (Footnotes omitted.)  In so stating the court noted that an expert report had been received from an Austrian Superior Court Judge and that "*all* foreign plaintiffs are pursuing actions in Austrian courts arising out of the ski train fire." *Id.*  No such evidence or facts exist in this case.

## II.     SURREPLY TO NEW ARGUMENTS AND/OR "FACTS" ON THE ALLEGED FAILURE TO STATE A CLAIM.

1.     Defendants argue an incorrect new "fact" for the first time that:

> Constantia allegedly lent $3 million to Oracle, with Pinnacle's knowledge and encouragement, so that Oracle could buy its way out of the July LOI. . .  *See*, Dickman Affidavit, ¶ 21 - Compl. ¶ 36.

Reply 12.  The citations provided by Defendants contradict their statement on "Oracle [buying] its

way out." This is a misguided effort to steer the Court away from Pinnacle and the Defendants' actions towards it. It was Pinnacle that needed to buy its way out of the July LOI, which it had signed, not Oracle. ¶ 15.

2.     Defendants then argue another incorrect new "fact" and newly argue that:

Plaintiffs do not allege a single communication between any Defendant and Centre Lane, let alone that any Defendant induced Centre Lane to terminate the July LOI. *See, Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F.Supp.2d 1269, 1276 (D.Kan. 1998)("Tortious interference with a prospective business relationship **requires some type of communication** between the defendant and third party in which the defendant induces a third party not engage in [the] prospective contract. . . .")

(Emphasis added). Reply 12. In fact, the Plaintiffs specifically allege "some type of communication between the defendant and the third party," *i.e.*, the wire of $3 million that went from Constantia to Centre Lane. ¶ 37. The quotation purportedly from *Altrutech* is in reality a quotation from *DP-Tek, Inc. v. AT&T Global Info. Solutions Co.*, 891 F.Supp. 1510, 1516 (D.Kan. 1995) *aff'd*, 100 F.3d 828 (10th Cir. 1996). In either case the argument is premised on Kansas law, and the source case, *DP Tek*, has no citation for the statement.

3.     Defendants newly argue that Wells' conduct was not foreseeable, Reply 14-15, despite express allegations in the Complaint. ¶¶ 17, 38, 40, and 53. Defendants' argument is premised on a citation from the Complaint that notably omits key phraseology contradictory to Defendants' argument: "(as had been threatened by Wells)." ¶ 53.

4.     Defendants then newly argue:

Plaintiffs allege that the OEP Defendants should face claims because their capital was needed to consummate the alleged deal. Opp. at 27. However, a portfolio company's need for capital from its owners doe not expose them to liability. *See, e.g., Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001) ("A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego."). Alternatively, Plaintiffs seek to bring claims against the OEP Defendants because von Hugo, the Vice Chairman of Constantia (Compl. ¶ 21), also was a "Management Partner of OEP." However, "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998) (citations omitted). Plaintiffs' theory that von Hugo was acting *qua* OEP

Europe partner, and not *qua* Vice Chairman of Constantia, in connection with Constantia's alleged deal is implausible. The mere allegation that Plaintiffs were told at one point that von Hugo was an officer of OEP Europe is by no means an adequate basis to expose the OEP Defendants to liability. Thus, there is no cognizable basis for permitting claims against the OEP entities.

Reply 10-11 (footnotes omitted).[6]  Again, Defendants try to misdirect the Court.  The thrust of Plaintiffs' allegations are that Constantia and OEP were acting jointly to acquire Pinnacle's stock in Oracle. Defendants then further misdirect the Court by insinuating that Plaintiffs allege that, "von Hugo was acting *qua* OEP Europe partner and not *qua* Vice Chairman of Constantia . . . "  The theory of Plaintiffs is that von Hugo was acting for OEP, or OEP Europe, and not on behalf of Constantia, because his role was focused on the provision of funds for the transaction. Response 16-17 ((i)Unger:  "We will have to see.  After I get with Chris [von Hugo] if JP [Morgan] can give us some support here because in all . . . "  (ii) von Hugo:  "But, but Centre Lane would just go bat shit if they knew it was the private equity activities of JP Morgan."  (iii) von Hugo:  "So, so Thomas [Unger] I mean, uh, we'll have to huddle afterward, but it sounds like we have to think our way through, uh, you know, I mean, technically, it's not a problem to get money from here to there in, in six days."  Response 17.)

5.      In the Motion, the Defendants argue implausibility with respect to allegations of malice, Motion 25, and the implausibility of Pinnacle's fraud claim, Motion 34.  For the first time in Reply, Defendants argue that "Plaintiffs' contradictory allegations preclude any plausible inference of an enforceable contract."  Reply 18.  Plaintiffs have shown the absence of the alleged contradictions, Response 39-40, but a new contradiction is alleged that there is no allegation of which party was "empowered" to choose between acquisition or financing.  Reply 16-17.  This argument echoes the tendentious parsing that is in every argument on contradiction made by the Defendants.  Plaintiffs allege, "The proposed transaction would have given Constantia and One

---

[6]  This argument should have been made in the Motion as shown by the citation to "Opp. at 27" which has a direct quotation from the Complaint at ¶ 34, and at which the argument is directed.

Equity Partners the opportunity to purchase Oracle on terms equal to or better than the terms of proposed Centre Lane transaction embodied in the July LOI."  ¶ 27.  The conduct of due diligence is also alleged.  ¶¶ 22, 30, and 31.  Clearly, the decision was to be made by the Defendants.

In support of this proposition, Defendants cite to *Mora v. Univ. of Texas SW Med. Ctr.*, 469 F.App'x. 295, 299 (5th Cir. 2012) and *Herrera v. Cnty of L.A.*, 42 F.App'x. 263, 265 (9th Cir. 2012). Neither of these cases concerned allegations of contract.  The decided portion of *Mora* addresses a retaliatory discharge claim where the complaint factually contradicted the argument as to an essential element of the Title V. claim asserted.  *Mora, supra* at 298-299.  In *Herrera* the allegation of a "policy or practice" was directly contradicted by "allegations in Jonathan's complaint and the attachments to Jonathan's complaint."  *Herrera, supra* at 265. Plaintiffs' allegations have no similarity to these two cases that have explicit allegations and explicit contradictions.  Indeed, both cited cases were appellate cases where there was no consideration of a denial of a right to amend, or of futility, neither of which bridges have been crossed in this case.

 s/Laurence L. Pinkerton
Laurence L. Pinkerton, OBA #7168
Pinkerton & Finn, P.C.
Penthouse Suite
15 East 5th Street
Tulsa, Oklahoma 74103-4303
Tele: 918-587-1800
Fax:  918-582-2900
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2013, I electronically transmitted the foregoing pleading, to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

John D. Russell, Esq.
FELLERS, SNIDER, BLANKENSHIP,
  BAILEY & TIPPENS
321 S. Boston Ave., Suite 800
Tulsa, Oklahoma 74103-3318

Gabrielle Gould, Esq.
Cheryl Howard, Esq.
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022

/s/ Laurence L. Pinkerton