IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) PINNACLE PACKAGING COMPANY, INC., an Oklahoma corporation, <br> 2) POLO ROAD LEASING, LLC, an Oklahoma limited liability company, and <br> 3) J. SCOTT DICKMAN, <br><br>　　　　Plaintiffs, <br><br>vs. <br><br> 4) ONE EQUITY PARTNERS LLC, a Delaware limited liability company, and <br> 5) CONSTANTIA FLEXIBLES GmbH, an Austrian corporation, <br><br>　　　　Defendants. | Case No. 12-CV-537-JED-TLW |

---

**REPLY OF PLAINTIFFS TO DEFENDANTS ONE EQUITY PARTNERS, LLC, ONE EQUITY PARTNERS (EUROPE) GmbH, AND CONSTANTIA FLEXIBLES GmbH's OPPOSITION TO PLAINTIFFS' MOTION TO AMEND**

---

Laurence L. Pinkerton, OBA #7168
Pinkerton & Finn, P.C.
Penthouse Suite
15 East 5th Street
Tulsa, Oklahoma 74103-4303
Tele: 918-587-1800
Fax: 918-582-2900
ATTORNEYS FOR PLAINTIFFS

January 2, 2014

The Plaintiffs, Pinnacle Packaging Company, Inc., Polo Road Leasing, LLC, and J. Scott Dickman (collectively "Plaintiffs"), hereby file their reply to *Defendants One Equity Partners, LLC, One Equity Partners (Europe) GmbH, and Constantia Flexibles GmbH's Opposition to Plaintiffs' Motion to Amend* (the "Response").

## INTRODUCTION

The briefing on the Opposed Motion to Amend Complaint (the "Motion"), and on the Motion to Dismiss reveals the equities of this dispute that support adding the equitable claim of promissory estoppel. Pinnacle, entered the July [2012] LOI to sell its stock to Centre Lane. This contract was terminated, but on August 10, 2012, a new contract with Centre Lane was entered at a loss to Plaintiffs of not less than $18 million from the July LOI. In the intervening period, an Austrian corporation and a private equity fund of JP Morgan (collectively, "Defendants") contacted Pinnacle in Tulsa, Oklahoma, and made promises (and representations) that led to a $3 million loan to cause the termination of the July LOI and left Pinnacle with the expectation that its debt to Wells would be paid or refinanced, which did not occur.

Now before this Court in the Motion is the issue of whether Pinnacle can even get into Court after such a devastating loss and allege the barest of claims, *i.e.*, whether Defendants make a clear and unambiguous promise(s) that included an action taken, *i.e.*, the $3 million loan, and an action partially taken, *i.e.*., the contact of Wells, but left the unfulfilled promise of loan acquisition or payoff.

To obstruct the basic justice sought, the Defendants assert delay and the failure to make an allegation of promissory estoppel, that, if defective, can never be repaired. This should not stand.

**I.  THERE IS NO UNDUE DELAY OR UNTIMELINESS IN THE FILING OF PLAINTIFFS' MOTION TO AMEND, AND DEFENDANTS WHOLLY FAIL TO ESTABLISH THE SAME.**

    **A.  Defendants' Argument Distorts the Significance of the Relevant Filing Dates, and the Procedural Posture of the Motion.**

Defendants argue that the Motion to Amend (the "Motion") "was filed more than one year after Plaintiffs' original Complaint and eleven months after the Amended Complaint," Response 3. Standing alone this sounds ominous, but in a revealingly gesture, the Defendants do not claim undue prejudice. What Defendants fail to elaborate that distorts their account of events is that the initial Complaint, filed more than one year ago, was strongly challenged by Defendants on the ground of improper service, and new service based on letters rogatory was commenced. [DKT 37]. It was not until 8 months after the original Complaint, or June 5, 2013, that Defendants regarded themselves as served with the Amended Complaint. Response 2. After briefing on Defendants' Motion to Dismiss was concluded, but before any ruling by the Court or the entry of any scheduling order, the Motion was filed. The Motion had no affect on the prior briefing, and was filed well in advance of the oral argument on the Motion to Dismiss now set for January 31, 2014.

The filing and content of the Motion and proposed Fifth Claim, as shown hereafter, did not present any of the procedural or substantive infringements committed in the cases cited by Defendants in their Response that led to the rejection of amendments proposed in the cases. Rather, the Motion was made without allegation of new facts in the new claim, as admitted by the Defendants, Response 6, before **any** rulings by this Court on the Motion to Dismiss, and prior to any scheduling order setting a cutoff date for amendments. Further, the Defendants have had the opportunity to lodge an unfettered full-scale assault against the Motion and the proposed Fifth Claim. Response. Despite this, the Defendants used only ten of the twenty-five pages they were authorized to use to attack the Motion and the proposed Fifth Claim. [DKT. 76] L.Cv.R. 7.2. In their opposition there was nothing the Defendants were prohibited from raising by affidavit or otherwise in opposition. Defendants also have requested and received an oral argument, which has been set on January 31, 2014, well after the completion of briefing on the Motion.

In sum, the filing dates and timing of matters in this case related to the Motion (i) have not

prejudiced the Defendants despite their feigned effort to make it so appear, (ii) are not violative of any Court order, and (iii) are of no consequence, particularly when Defendants have had an opportunity to fully challenge the Motion and proposed Fifth Claim before oral argument.

### B.     The Defendants Fail to Show Untimeliness or Undue Delay in the Filing.

Despite citation to seven cases in their argument asserting untimeliness and delay, the Defendants fail to synthesize a rule or standard for the Court to use in judging whether there was untimeliness or delay in the filing of the Motion. This failure led the Defendants to the logical errors of assuming delay and asserting delay in a conclusory fashion, and having done that, then arguing that untimeliness is a basis to deny the Motion, arguing there must be an adequate explanation for delay, and arguing that the moving party must demonstrate excusable neglect. Response 4. Yet, these arguments have no factual or legal basis, because delay or untimeliness in filing the Motion was not shown. There is no legal rule that every claim based on the original alleged facts must be asserted at one time and any proposed amendment thereafter is untimely.

The most that Defendants do by way of asserting a standard or rule on untimeliness or delay is to express this argument:

> Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial. [citations omitted].

Response 4-5. Defendants, however, ignore the opening clause of this statement because they admit:

> Plaintiffs' promissory estoppel claim is based on the exact same allegations underlying Plaintiffs' fraud and breach of contract claims that appeared in Plaintiffs' initial Complaint in September, 2012 and the Amended Complaint in December, 2012.

Response 6. In other words, Defendants' argument has no application here.

In the absence of a synthesized standard to assess the existence of untimeliness or delay, an analysis of each of Defendants' cited cases is necessary to show that none of them, or any group of them, establish that in the instant circumstances there was undue delay or untimeliness:

3

1. In *Shifrin v. Toll*, 483 Fed.App'x. 448, 446 (10th Cir. 2012) the court ruled on a 12(b)(6) motion, an amended complaint was filed, there was a further motion to dismiss, briefing was completed, and then a motion to file a second amended complaint was filed. This proposed second amended complaint had additional factual allegations and sought to add a third party. *Id.* None of these circumstances are present here, *i.e.*, there has been no court ruling, no new factual allegations are tendered, nor is there an effort to name a new party.

2. In *Hill v. Pugh*, 75 F.App'x. 715, 718 (10th Cir. 2003), the court accepted certain amendments apparently made by the plaintiff in the course of briefing on a motion to dismiss, the court then ruled on the motion to dismiss. Thereafter, the motion to amend was filed. That motion sought to substitute a claim on which there had been no exhaustion of administrative remedies, it sought to add additional facts, and to name additional defendants. *Id.* at 717. None of these circumstances are present here.

3. In *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1025 (10th Cir. 1994), a § 1983 claim was wholly dismissed by the court on motion, and then there was an effort to amend. The amendment sought to substitute an entirely new theory for the case after the primary theory had been dismissed. *Id.* at 1027. None of these circumstances are present here.

4. In *Weekley v. Bennett Motor Express*, 858 F.Supp.2d 1257, 1265 (N.D.Okla. 2012), the plaintiffs sought to amend four months after the court deadline for filing motions to amend. That amendment asserted wholly new facts. *Id.* at 1264. None of these circumstances are present here.

5. In *Spirit Bank Corp. v. Warner Aviation*, 2011 WL 6415472 at *2 (N.D. Okla. 2011), a scheduling order was entered on April 19, 2011 that set the final day for amendment on May 17, 2011. A motion to amend was filed on November 7, 2011, or six months after the court's deadline. The amendment set forth a new theory, supported by new facts that were said to have been just learned, but that was disputed by the court in its analysis. *Id.* at *5. None of these circumstances

are present here.

6. *Schultz v. Unumprovident Corporation*, 2010 WL 3417863 at *2 (N.D. Okla. Aug. 26, 2010). While this case is cited generally, it should be noted that the proposed amendment was four years after the case was filed and there had been numerous scheduling orders entered. None of these circumstances are present here.

7. In *Bjorklund v. Miller*, 2009 WL 4016079 at *1 (N.D. Okla. 2009), a motion to amend was filed after there had been a ruling on a motion to dismiss. *Id.* at *1. The amendment sought to add a new party. None of these circumstances are present here.

In sum, Defendants fail to develop a standard to show any untimeliness or delay, and not one or any group of Defendants' cited cases supports their being any untimeliness or delay in the filing of the Motion in the circumstances present here.

II. **PLAINTIFFS' MOTION TO AMEND SHOULD BE GRANTED BECAUSE THE PROPOSED CLAIM FOR PROMISSORY ESTOPPEL IS NOT FUTILE OR OTHERWISE SUSCEPTIBLE TO A MOTION TO DISMISS.**

A. **Plaintiffs Have Pleaded a Clear and Unambiguous Promise Made by the Defendants.**

Plaintiffs' proposed Fifth Claim includes ¶ 62 that states:

> As set forth in paragraph 35, on July 25, 2012 the Defendants made a clear and unambiguous promise to Pinnacle and Dickman that, if a settlement was reached with Centre Lane that (i) terminated any "exclusivity period," (ii) terminated the July LOI, and (iii) settled the Delaware litigation and all related claims, then the Defendants would either (a) pay off the Wells Debt and provide a new loan to Oracle, or (b) purchase the Wells Debt from Wells and continue the extension of credit to Oracle. Under either (a) or (b) the terms of credit extended would be at least as favorable as the existing Wells Debt and such credit would terminate with the acquisition of Oracle, or six months from July 31, 2012.

Motion, Ex. A. [DKT 70]. Defendants falsely argue that this promise arises from a "mish mash of phone calls and emails." Response 8. While such hyperbole might be amusing to draft,[1] it is not

---

[1] Even Defendants do not believe their statement, *e.g.*, they assert, "Plaintiffs, all sophisticated parties, . . ." Response 7 at fn. 3, and surely Defendants likewise regard von Hugo, Unger, and Blaige as sophisticated. Therefore, was there really a "mish mash," or were the parties

5

borne out by the facts alleged in the Amended Complaint and in the proposed ¶ 62. There were meetings, phone calls, and emails among the representatives the Plaintiffs and Defendants, but these culminated in decisive phone calls on July 24, where it is expressly alleged that von Hugo, acting for One Equity Partners, ¶¶ 20 and 22, stated that Constantia would advise Pinnacle about the ability of Constantia and One Equity Partners to fund the Centre Lane Settlement and to purchase or pay off the Wells Debt. ¶ 34. The Motion then specifically points in ¶ 62 to the final phone call on July 25 as alleged in ¶ 35, where the promise to accomplish the Centre Lane Settlement and the Wells Refinancing (as defined in ¶ 32) was affirmed.

> Despite the specifics of these allegations, Defendants complain that:
>
> Plaintiffs have not alleged which "Defendants" made the alleged promise to Plaintiffs (see Defendants' Motion to Dismiss at 31), nor have they alleged key terms of the purported refinancing (see id. at 28-29), let alone terms that are "reasonably certain and definite."

Response 8. In fact, the specific Defendants are shown in that the Defendants are alleged to have acted together, ¶¶ 6 and 20. In addition, Constantia's President, Unger, in briefing on the Motion to Dismiss is specifically identified as speaking in the July 25, 2012 telephone call. Plaintiffs' Response on Motion to Dismiss [DKT 57], Ex. A. ¶ 57. Further, Defendants' argument that "key terms of the purported refinancing" are not alleged, and therefore there are not terms that are reasonably certain and definite" Response 8, stretches the requirements of promissory estoppel as cited in *Eureka Water Co. v. Nestle Waters N.A., Inc.*, 2013 WL 245864, at *4 (W.D. Okla. 2013), which only requires that the promise must be "reasonably certain and definite." Response 7. Nothing in *Eureka* requires the specificity argued by Defendants. Moreover, with regard to the terms of the Wells Refinancing the Defendants ignore the express allegations in the Amended Complaint that:

---

proceeding in a compressed time frame to tackle very complex issues. Defendants' characterization is another betrayal of their tactics of the Defendants to distract the Court and denigrate Plaintiffs.

> Moore thus made it clear in the e-mail and in telephone conferences on the same day [July 30, 2012] that the Wells debt had to be paid in full by the next day, July 31, 2012. Moore also requested an update on the loan transaction documentation. The parties on that same day, July 30, 2012, exchanged a series of e-mails concerning the status of the draft loan documents. **Defendants' counsel responded that Constantia was insisting on being able to talk with Wells' representatives before releasing the proposed loan documentation.**

¶¶ 39 (emphasis added). There follows in the Amended Complaint the allegation of the Defendants' total breach of their promise and representation to effect the Wells Refinancing leading to the result that no loan terms were of any significance, ¶ 40. This, even though the required conversation with Wells insisted upon by Defendants' counsel had occurred, ¶ 40 – the conversation just lacked the promised (and represented) content. Defendants thus made it impossible for Plaintiffs to provide the "key terms," or any terms for that matter.

Defendants then allege there is a "new-found allegation" that these terms "would be at least as favorable as the existing [Oracle] debt." This is not a "new allegation." Rather, it is implicit in the allegation that:

> Based on these communications, Pinnacle and Defendants reached an oral agreement (later confirmed in e-mail communications among the parties) whereby Constantia would refinance the secured indebtedness of Oracle with Wells and then work on a transaction pursuant to which Constantia would either acquire Oracle or would continue as the secured lender of Oracle until the indebtedness could be refinanced with a third party lender.

¶ 32. If Constantia were to "continue as the secured lender" it is implicit that the terms of the loan continue given the absence of allegations to the contrary. This same intention is expressed in the next paragraph of the Amended Complaint:

> Finally, and critically, Defendants agreed that they would either (a) pay off the Wells Debt (which debt equaled approximately $19 million) and provide a new loan to Oracle, or (b) purchase the Wells Debt from Wells ("a" or "b" are hereafter referred to as the "Wells Refinancing").

¶ 33. Again, it is implicit that if the Wells Debt was purchased the terms of the loan would continue given the absence of allegations to the contrary. *Rounds v. Clements*, 495 Fed.App'x. 938, 939 (10th Cir. 2012) (plaintiffs are entitled to reasonable inferences); *Robinson v. Keita*, 2013 WL328942, *2

(D.Colo. 2013).

In challenging the Wells Refinancing, the Defendants further overreach by again asserting the absence of specific terms, *e.g.*, "(i) the payment schedule for the loan; (ii) the type of loan," etc. Response 8. As shown above, Defendants caused the absence of loan terms.

Defendants then challenge the very existence of a promise of the Wells Refinancing by referring to a "so called oral 'promise' to lend Oracle approximately $19 million." This is nonsense. First the Wells Refinancing was a part of a promise (and representation) to effect the Centre Lane Settlement and to acquire the Pinnacle Debt from Wells, ¶ 16, which debt had Pinnacle and Dickman as borrowers and guarantors, ¶ 16 and Response to Motion to Dismiss, at 9, and was fully secured. ¶ 16. Moreover, apart from the allegation, the promise may be inferred from the effectuation of the $3 million Centre Lane Settlement, from Blaige's admission in response to Dickman's inquiry about documentation for the "take out of Wells," Ex. 2, P00825 [DKT 57-2] (attached), from the July 31, 2012 due date of the Wells Debt, ¶ 39, and from von Hugo's call to Wells, ¶ 40. Again, Defendants show a tendency to make up arguments and to ignore the allegations of the Amended Complaint and their incorporation in the proposed Fifth Claim.

Continuing in their fantasy world of argument, the Defendants state:

> As set forth in Defendants' Motion to Dismiss, the only alleged basis for the "terms" of the purported promise is Mr. Dickman's unsupported statement that "[i]t was [his] belief that if the [Oracle] Debt were acquired by the Defendants as represented and promised, its terms would have continued . . ." Affidavit of Scott Dickman (Dickman Aff."), ¶ 31 (emphasis added).

As shown above, Plaintiffs have alleged why no actual loan terms were provided. Nevertheless, the Wells Refinancing was premised on far more than Dickman's understanding. It first was inextricably linked to the Centre Lane Settlement which encompassed a release of all contractual rights of Pinnacle under the July LOI, and this was effected by Constantia's payment of $3 million. ¶¶ 32-35. Further, the terms of the Wells Debt to be acquired had an objective existence apart from Mr Dickman's belief, and these terms were known to Defendants. ¶ 29. Defendants' in effect did

not provide any change to the existing terms of the Wells Debt. ¶ 39. Finally, Hank Bird was a participant in all discussions confirming the Wells' Refinancing. ¶¶ 34 and 35.

Next, the Defendants continue a pattern in their briefing that began in their Motion to Dismiss at 26, 27 at fn. 21, 29 (twice), 30 (twice), and continued their Reply on the Motion to Dismiss at 2, 14, 16, 17 (three), 18, by slinging the charge of "contradictory allegations." Response 9. In so doing, Defendants have never cited a case on "contradiction," except *Key v. Naylor, Inc.*, 268 Ga. App. 419, 422-423 (Ga.Ct.App. 2004), Motion to Dismiss at 30, but that case never uses the term "contradiction." Moreover, no extant federal case has been found that defines the term, but attached as Exhibit A is a page from the internet showing the definition of the word "contradict" where overwhelmingly the meaning is to "say the opposite." None of the allegations of Plaintiffs argued as contradiction "say the opposite," including the argued example with two bullet points in the Response at 9. The first bullet point picks up on Defendants' original argument that there is a contradiction between "Constantia/One Equity Partners would remain as Oracle's lender until such time as Oracle could arrange permanent financing from an institutional or other lender, if the loan to Oracle was not consummated) (emphasis added)," and Constantia/One Equity acting as lender "for a period not to exceed six months." This is not a contradiction, or the opposite, but only a limitation on the length of time initially described as a period to obtain a new lender. The second bullet point is likewise not a contradiction, *i.e.*, "not less than six months" allows six months and the potential for negotiations that could extend the terms. Moreover, the specific allegation in the Amended Complaint is for six months. ¶ 51.

Finally, Defendants fail to in any way to demonstrate why an amendment cannot cure any defect that would warrant a dismissal.

**B.      Plaintiffs Have Otherwise Properly Pled Promissory Estoppel.**

The Defendants half-heartedly argue by footnote that:

> . . . Plaintiffs fail adequately to plead foreseeable or justifiable reliance. Plaintiffs, all sophisticated parties, cannot plausibly allege that they reasonably relied on a multi-million dollar commitment they seek to distill from comments made by unspecified Defendant(s) during aborted deal talks.

Response 7 at fn. 3. In so stating, the Defendants' ignore the specific allegation by Plaintiffs in the proposed amendment:

> Pinnacle and Dickman reasonably relied upon this promise to their detriment, in that they acted to reach the settlement with Centre Lane and did conclude it at a const of $3 million and the release of the rights under the July LOI, but they did not in turn receive from Defendants the performance of (a) or (b) as set forth in paragraph 62.

Motion, Ex. A, ¶ 64 [DKT 70]. Obviously, the partial performance of the alleged promise through the Centre Lane Settlement that in itself encompassed $3 million advanced by Constantia, all as alleged in ¶ 62 of Ex. A, in ¶¶ 36 and 37, shows there was reasonable reliance. Moreover, Plaintiffs (as sophisticated businessmen) allege the reasonableness of their reliance:

> Had Defendants (directly by management or indirectly through counsel or Blaige) given Pinnacle so much as an inkling that Defendants would embark on this quixotic scheme with regard to the Wells debt – let alone renege on its promises to Pinnacle because its quest did not succeed – Pinnacle would not have executed the Settlement Agreement. Pinnacle instead would have proceeded to consummate the agreement with Centre Lane under the terms set forth in the July LOI and further delineated in the draft Stock Purchase Agreement.

¶ 40. In addition, Plaintiffs allege the admission of Defendants concerning their reasonable reliance:

> On August 3, 2012 Constantia Chief Executive Office Thomas Unger called Dickman in Tulsa to advise that Constantia and One Equity Partners would not honor the agreements with Pinnacle that have been described herein.; Dickman expressed shock and advised Unger that Constantia's wrongful actions would result in significant damage to Pinnacle (in Tulsa) and its shareholders (virtually all of whom were in Tulsa). Dickman specifically advised Unger that Constantia's actions were in breach of its promises to Pinnacle Unger replied that he had "no argument for that point."

¶ 41. There was no "distillation." Response 7 at fn. 3. Rather, all parties knew, and Defendants admitted, the breach of the promise (and representation) on the Wells Refinancing.

        s/Laurence L. Pinkerton
Laurence L. Pinkerton, OBA #7168
Pinkerton & Finn, P.C.
Penthouse Suite
15 East 5th Street
Tulsa, Oklahoma 74103-4303
Tele: 918-587-1800
Fax: 918-582-2900
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2014, I electronically transmitted the foregoing pleading, to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

John D. Russell, Esq.
FELLERS, SNIDER, BLANKENSHIP,
 BAILEY & TIPPENS
321 S. Boston Ave., Suite 800
Tulsa, Oklahoma 74103-3318

Gabrielle Gould, Esq.
Cheryl Howard, Esq.
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022

/s/ Laurence L. Pinkerton

Case 4:12-cv-00537-JED-TLW   Document 57-2 Filed in USDC ND/OK on 09/13/13   Page 407 of 534

**Scott Dickman**

From: thomasblalge <tblalge@blalge.com>
Sent: Monday, July 30, 2012 10:41 PM
To: Scott Dickman
Subject: Re:

Hi Scott
Its just that Chris and Thomas want to work in sequence.
Tom

On Jul 30, 2012, at 10:08 PM, "Scott Dickman" <scott@pinnaclepkg.com> wrote:

> Is it true the loan document to take out Wells is being withheld until Chris talks to Wells?
>
> I think we have earned a sign of trust on this. Is this something I should call Thomas about or should I call someone else?



+You Search Images Maps Play YouTube News Gmail More ·　　　　　　　　　　　　　Sign in

Google | contradict

Web   Images   Maps   Shopping   Recipes   More ▾   Search tools

About 4,310,000 results (0.30 seconds)

## con·tra·dict
/ˌkäntrəˈdikt/

*verb*

1. deny the truth of (a statement), esp. by asserting the opposite.
   "the survey appears to contradict the industry's claims"
   *synonyms:* deny, rebut, dispute, challenge, counter, controvert;   More

---

**contradict - definition of contradict by the Free Online Dictionary ...**
www.thefreedictionary.com/contradict ▾
v. con·tra·dict·ed, con·tra·dict·ing, con·tra·dicts. v.tr. 1. To assert or express the opposite of (a statement). 2. To deny the statement of. See Synonyms at deny. 3.
Contradicting - Contradictory - Contradictor - Contradictorily

**Contradict - Merriam-Webster Online**
www.merriam-webster.com/dictionary/contradict ▾
to say the opposite of (something that someone else has said) : to deny the truth of (something). : to deny or disagree with what is being said by (someone).

**contradict - Dictionary Definition : Vocabulary.com**
https://www.vocabulary.com/dictionary/contradict ▾
Definition of contradict : "Contra-" usually means "against," and to contradict is to go against or say the opposite of what someone else is doing or saying.

**Contradict | Define Contradict at Dictionary.com**
dictionary.reference.com/browse/contradict ▾
to assert the contrary or opposite of; deny directly and categorically. 2. to speak contrary to the assertions of: to contradict oneself. 3. (of an action or event) to ...

**Contradict Synonyms, Contradict Antonyms | Thesaurus.com**
thesaurus.com/browse/contradict ▾
Synonyms for contradict at Thesaurus.com with free online thesaurus, antonyms, and definitions. Dictionary and Word of the Day.

**contradict - Cambridge Dictionary - Cambridge University Press**
dictionary.cambridge.org/dictionary/british/contradict ▾
contradict verb - definition, audio pronunciation, synonyms and more for contradict verb: (of people) to say the opposite of what someone else has said, or (of ...

**Contradiction - Wikipedia, the free encyclopedia**
en.wikipedia.org/wiki/Contradiction ▾
In classical logic, a contradiction consists of a logical incompatibility between two or more propositions. It occurs when the propositions, taken together, yield two ...

**contradict - Wiktionary**
en.wiktionary.org/wiki/contradict ▾
contradict (third-person singular simple present contradicts, present participle contradicting, simple past and past participle contradicted). (obsolete) To speak ...

**Urban Dictionary: contradiction**
www.urbandictionary.com/define.php?term=contradiction ▾
A contradiction is two propositions used in combination where one makes the other impossible. It is something that is A and non-A at the same time....

**contradict - Definition from Longman English Dictionary Online**
www.ldoceonline.com/dictionary/contradict ▾

**EXHIBIT A**

Definition of contradict from the Longman Online Dictionary of Contemporary English.
The Longman English Dictionary provides support and resources for those ...

Searches related to contradict

| | |
|---|---|
| contradict example | contradict crossword |
| what does contradict yourself mean | contradict movement |
| contradict in a sentence | contradict definition examples |
| contradict meaning | define contradict yourself |

1  2  3  4  5  6  7  8  9  10    Next