**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

PINNACLE PACKAGING COMPANY,　)
INC., POLO ROAD LEASING, LLC,　)
J. SCOTT DICKMAN,　)
　　　　　　　　　　　　　　　)　　Case No. 12-CV-537-JED-TLW
　　　　　　　Plaintiffs,　　)
　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　)
　　　　　　　　　　　　　　　)
ONE EQUITY PARTNERS LLC, ONE　)
EQUITY PARTNERS (EUROPE) GmbH,　)
and CONSTANTIA FLEXIBLES GmbH,　)
　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　)

## OPINION AND ORDER

Before the Court is the Motion to Dismiss (Doc. 53), filed by the defendants, One Equity

Partners LLC (One Equity LLC), One Equity Partners (Europe) GmbH (One Equity Europe),

and Constantia Flexibles GmbH (Constantia). As independent grounds for dismissal, defendants

assert that the Court lacks personal jurisdiction over them such that the action should be

dismissed under Fed. R. Civ. P. 12(b)(2), the Amended Complaint fails to state a claim under

Fed. R. Civ. P. 9, 12(b)(6), and the plaintiffs have "unclean hands."

**I.　　Background** [1]

**　　A.　　Overview**

For their damages claims, the plaintiffs, Pinnacle Packaging Company, Inc. (Pinnacle),

Polo Road Leasing, LLC (Polo Road), and J. Scott Dickman allege that they suffered losses

when Oracle Flexible Packaging, Inc. (Oracle) was sold on "fire sale" terms to Centre Lane

Partners LLC (Centre Lane), after the defendants, *inter alia*, breached an alleged agreement to

pay off Oracle's debt to Wells Fargo or to purchase the debt and extend credit to Oracle.

---

[1]　　Except where noted, the facts set forth herein are taken from plaintiff's Amended
Complaint (Doc. 30).

Pinnacle was the sole shareholder of Oracle. Polo Road is an affiliate of Pinnacle. Dickman is the majority shareholder and chief executive of Pinnacle, the sole Manager of Polo Road, and was the President, CEO, and Chairman of the Board of Directors of Oracle at the time, and he personally dealt with the management and representatives of the defendants. Oracle, Pinnacle, and Dickman were indebted on the Wells Fargo debt, and Pinnacle and Dickman were also guarantors of that debt. (Doc. 30 at ¶ 12; *see also* Doc. 57-1 at 2, ¶ 3; Doc. 57-4 at 26). Plaintiffs assert tort and contract claims against the defendants as a result of the losses they allegedly incurred from the distressed "fire sale" of Oracle and certain assets of Polo Road. (Doc. 30 at ¶ 12).

### B. Oracle's Liquidity Problem

At the time of the events described in the Amended Complaint, Oracle was "very well positioned in the U.S. flexible packaging industry and had assets and marketing resources to achieve substantial growth ... but it was undergoing substantial liquidity problems due to business and general economic circumstances beyond its control that began in October, 2011." (*Id.* at ¶ 10). Constantia, an Austrian entity, is "one of the largest flexible packaging firms in the world," and Oracle was an attractive acquisition candidate for Constantia to acquire a manufacturing operation in the United States. (*See id.*). Oracle's senior management and ownership was located in Tulsa, Oklahoma, and Oracle's principal manufacturing plant was in North Carolina. (*Id.* at ¶ 11). At the time, Oracle's relationship with its bank, Wells Fargo, under a 2010 Credit and Security Agreement, was strained. Wells Fargo had alleged at least one covenant violation of that agreement, and it was clear that Wells Fargo desired a full repayment of Oracle's indebtedness. (*See id.* at ¶ 17).

### C.     Letters of Intent and Legal Action between Pinnacle and Centre Lane

On March 19, 2012, Pinnacle and Centre Lane executed a Letter of Intent (March LOI) under which Centre Lane would purchase all of Pinnacle's issued and outstanding capital stock upon certain conditions or would acquire the operations of Oracle by merging Oracle into a Centre Lane subsidiary. The March LOI contained an exclusivity provision that restricted Pinnacle's dealings with potential third-party purchasers of Pinnacle's stock or assets. In May, 2012, Centre Lane filed a civil action against Pinnacle in Delaware Chancery Court alleging that Pinnacle had breached the exclusivity provision.

Pinnacle and Centre Lane entered into an agreement to settle the Delaware action on July 4, 2012. That agreement, as amended on July 9, 2012, is referred to as the July LOI. The July LOI was on essentially the same terms as the March LOI, except that it modified the financial conditions. The July LOI called for a closing of the Pinnacle / Centre Lane acquisition transaction by July 31, 2012. (*Id.* at ¶ 15).

### D.     Potential Acquisition of Oracle and Refinancing of the Wells Fargo Loan

In the midst of the Pinnacle-Centre Lane acquisition discussions, Jan Homan, Chairman of the Supervisory Board of Constantia, contacted Dickman in Tulsa by telephone on May 15, 2012 and inquired about acquiring Oracle from Pinnacle. Dickman informed Homan regarding the status of discussions and agreements in place with Centre Lane and Wells Fargo. (Doc. 30 at ¶ 19). Homan later sent an email to Dickman in Tulsa and proposed a meeting at Oracle's North Carolina plant to discuss a "possible Joint Venture in whatever form." (*Id.* at ¶ 20). Homan indicated that Christopher von Hugo, a "management partner of [One Equity Partners]" would join Homan. Dickman conducted Internet research and found that von Hugo was described as a "Managing Director" of One Equity Partners. (*Id.*). On June 21, 2012, von Hugo and Homan

visited Oracle's North Carolina facility. Pinnacle officers, Ernest Holley and Chris Payne, attended the meeting with von Hugo and Homan. During the meeting, von Hugo was represented to be a partner in One Equity Europe, the Vice Chairman of Constantia, and the principal responsible for the acquisition of Constantia in 2009 by One Equity Partners. (*Id.* at ¶ 21). Homan and von Hugo expressed a strong interest in acquiring Oracle to increase Constantia's North American presence. (*Id.* at ¶ 22).

Following the June 21 meeting, von Hugo emailed Payne on July 4, 2012 and indicated that "[w]e have engaged Tom Blaige (of Blaige & Co.) to help us to proceed in the most expeditious manner." (*Id.* at ¶ 23). Blaige later contacted Dickman in Tulsa, and Pinnacle's status with Centre Lane and Wells Fargo was discussed. Blaige also spoke to Dan Scouler, whom Wells Fargo had installed as Pinnacle's restructuring officer. Blaige then emailed to Dickman his perception that Constantia would have to stand down because of Pinnacle's LOI with Centre Lane. When Dickman suggested that the parties focus on the purchase of the Wells Fargo loan, Blaige inquired of Dickman whether there was an exclusivity agreement and Dickman responded that the exclusivity provision of the LOI did not cover refinancing of the Wells Fargo debt. (*Id.* at ¶ 24). Dickman contacted Centre Lane, and Centre Lane provided a verbal assurance followed by a letter dated July 11, 2012 confirming that any discussions that Pinnacle might have regarding the refinancing of the Wells Fargo debt would not be in violation of the exclusivity provisions of the July LOI.

Blaige then arranged a conference call for July 12, 2012 between Dickman in Tulsa, Constantia's CEO, Thomas Unger, in Europe, Blaige in Chicago, Ed Parkinson, who was a Blaige employee in Atlanta, and Richard Kelsey, who was head of mergers and acquisitions at Constantia. Before the call, Dickman sent Blaige information related to the Wells Fargo loan

balance, which was then over $13,000,000, and identified a need for the loan to be purchased promptly. (*Id.* at ¶ 26). On the July 12 call, a meeting was arranged for the following day. Unger requested that Kelsey, who was then in Mexico, attend the meeting on behalf of Constantia. Because of flight schedules, the meeting was set in Houston, Texas. The purpose of the meeting was to outline an Oracle acquisition transaction "that would take Centre Lane and Wells [Fargo] 'out of the picture.'" (*Id.* at ¶ 27). The proposed transaction would provide Constantia and One Equity the opportunity to purchase Oracle on terms equal to or better than the terms of the proposed transaction with Centre Lane, as set forth in the July LOI. (*Id.*).

On July 13, 2012, Dickman, Blaige, Kelsey, and Frank Murphy III, another Pinnacle shareholder, met at a Houston hotel. It was determined that counsel should be retained immediately for Constantia / One Equity, and Blaige indicated that a loan agreement could be drafted by July 16, 2012. (*Id.* at 28). Following the meeting in Houston, Kelsey prepared a nondisclosure agreement, which was sent to Blaige, who sent it to Dickman in Tulsa for execution. On July 20, 2012, Blaige traveled to Tulsa, on behalf of the defendants, to meet with Dickman and discuss "taking out" the Wells Fargo debt, Pinnacle's status with Centre Lane, and due diligence issues on the potential acquisition of Oracle by defendants. (*Id.* at ¶ 30). During that visit, the parties participated in a conference call, which included Unger, Blaige, Kelsey, and Dickman. (*Id.*; *see also* Doc. 57-1 at 2, ¶ 3).

Following the Tulsa meeting, there were multiple telephone conferences and emails between representatives acting on behalf of Constantia and One Equity and representatives of the plaintiffs, exploring Constantia's potential refinancing of the Wells Fargo debt. Ultimately, Pinnacle and the defendants reached an oral agreement, which was later confirmed in email communications, whereby "Constantia would refinance the secured indebtedness of Oracle with

Wells [Fargo] and then work on a transaction pursuant to which Constantia would either acquire Oracle or would continue as the secured lender of Oracle until the indebtedness could be refinanced with a third party lender." (Doc. 30 at ¶ 32). "[A]s a condition to moving forward with this proposed arrangement, Constantia insisted that Pinnacle enter into an agreement with Centre Lane that would (i) terminate the July LOI and (ii) settle the Delaware litigation and all related claims." (*Id.*). Defendants authorized Pinnacle to offer up to $6,000,000 for the sole purpose of reaching a settlement with Centre Lane, and defendants agreed that, if Pinnacle were able to obtain a settlement for less than $6,000,000, Oracle would retain half the difference between the actual settlement payment to Centre Lane and $6,000,000. (*Id.* at ¶ 33). Plaintiffs refer to this payment of a settlement price differential as the "Incentive Payment.") (*Id.*). Defendants agreed that they would either pay off the Wells Fargo loan and provide a new loan to Oracle, or would purchase the Wells Fargo debt. (*Id.*).

Plaintiffs and Centre Lane entered into a written settlement agreement to terminate the July LOI and settle the Delaware litigation and all related claims, with Centre Lane to receive $3,000,000 as a settlement payment. (*Id.* at ¶ 36). Centre Lane was also relieved of any obligation to purchase the Pinnacle stock or acquire Oracle. To effect the payment to Centre Lane, Oracle was asked by Constantia to execute a $3,000,000 demand promissory note prepared by Constantia, and Constantia then wired the settlement funds directly to Centre Lane on July 30, 2012. (*Id.* at ¶ 37).

### E. Defendants' Conduct and the "Fire Sale" of Oracle

On July 30, 2012, at the request of Constantia, Dickman obtained a letter from Wells Fargo detailing the payoff amount due on the loan, and Dickman immediately forwarded a copy of the letter to defendants' New York counsel. (*Id.* at ¶ 38). Dickman advised Constantia that

Wells Fargo was expecting full payment of the loan by the following day. (*Id.* at ¶¶ 38-39). Instead of paying off or purchasing the debt, the defendants attempted, unsuccessfully, to negotiate a deal with Wells Fargo whereby Wells Fargo (i) would maintain the credit facility for an additional 45 days for a $1,000,000 fee, (ii) would be given the opportunity to participate in the financing of Constantia's acquisition of a company in Mexico, and (iii) and would be given the opportunity to participate in other financings that One Equity had in the works. (*Id.* at ¶ 40). Constantia's CEO then notified Dickman on August 3, 2012 that the defendants would not be consummating any transaction to take out the Wells Fargo debt. (*Id.* at ¶ 41).

Wells Fargo froze all of Pinnacle's accounts at the end of July, 2012, halting Oracle's cash flow and threatening immediate foreclosure and bankruptcy. Because the refinancing of Wells Fargo was never accomplished, Pinnacle was left with no choice but to complete a "fire sale" of Oracle and certain physical assets owned by Polo Road. (*Id.* at ¶ 42). According to plaintiffs, the defendants' failure to honor the agreement to either pay off or purchase the Wells Fargo debt constituted a breach of defendants' obligations and caused significant damages to the plaintiffs because, had plaintiffs known that the defendants would not take out the Wells Fargo debt, Pinnacle would not have executed the settlement agreement with Centre Lane. Instead, Pinnacle would have performed the deal with Centre Lane under the terms of the July LOI. (*Id.* at 40). The difference between the value of the July LOI transaction and the value of the Centre Lane Stock Purchase Agreement, which was executed on August 10, 2012, is at least $18,000,000, according to the plaintiffs. (*Id.*). Plaintiffs also allege that the defendants breached their agreement to pay the Incentive Payment equal to one-half of the difference between $6,000,000 and the lesser amount actually paid under the terms of the settlement agreement with Centre Lane on July 30, 2012. (*Id.* at ¶ 40).

Plaintiffs assert tort claims against the defendants for intentional interference with contractual performance or prospective contractual relations (First and Fourth Claims) and fraud (Third Claim), and Pinnacle asserts a claim for breach of contract (Second Claim).

## II.    Personal Jurisdiction

### A.    Standards

Plaintiffs bear the burden of establishing that the Court has personal jurisdiction over the defendants. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). "When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, ... the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *Id*. (citations omitted).[2] "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *Id*. "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). The allegations of the complaint must be accepted as true to the extent they are uncontroverted by a defendant's affidavit. *FDIC v. Oaklawn Apts.*, 959 F.2d 170, 174 (10th Cir. 1992). If the parties provide conflicting affidavits, all factual disputes must be resolved in plaintiff's favor, and a prima facie showing of personal jurisdiction is sufficient to overcome defendant's objection. *Id*.

For a court to exercise personal jurisdiction over a nonresident defendant, the plaintiff must demonstrate the existence of facts satisfying both the forum's long-arm statute and the Due

---

[2]    A hearing was held on defendants' motion.  The parties presented oral arguments, but no testimonial evidence was presented at the hearing.

Process Clause of the United States Constitution. *See Niemi v. Lasshofer*, 770 F.3d 1331, 1348 (10th Cir. 2014). "Because Oklahoma's long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry." *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc*., 205 F.3d 1244, 1247 (10th Cir. 2000) (citing *Rambo v. Am. S. Ins. Co*., 839 F.2d 1415, 1416 (10th Cir. 1988)); *see Niemi*, 770 F.3d at 1348; *see also* 12 *Okla. Stat.* § 2004(F).

"In order to evaluate whether the exercise of personal jurisdiction comports with due process," the court "must first assess whether 'the defendant has such minimum contacts with the forum state that he should reasonably anticipate being haled into court there.'" *Niemi*, 770 F.3d at 1348 (quoting *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159-60 (10th Cir. 2010)). If a defendant has minimum contacts with the forum state, the court then determines "whether the exercise of personal jurisdiction over [that] defendant offends traditional notions of fair play and substantial justice." *Id.*

The minimum contacts standard may be satisfied by showing general or specific jurisdiction. *Id.* A court "may, consistent with due process, assert specific jurisdiction over a nonresident defendant 'if the defendant has purposefully directed his activities at the residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Intercon*, 205 F.3d at 1247 (quoting *Burger King*, 471 U.S. at 472). When examining specific personal jurisdiction, the courts often apply slightly differing analyses in tort cases and contract cases. *See Niemi*, 770 F.3d at 1348 *(*citing *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008)). In tort cases, the courts generally apply a "purposeful direction" test, whereas a "purposeful availment" test is used in contract cases. *See id.*; *see also Dudnikov*, 514 F.3d at 1071 ("In the tort context, we often ask whether the

9

nonresident defendant 'purposefully directed' its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state").  In a tort suit, "'purposeful direction' has three elements: (a) an intentional action ... that was (b) expressly aimed at the forum state ... with (c) knowledge that the brunt of the injury would be felt in the forum state.'"  *Niemi*, 770 F.3d at 1348 (quoting *Newsome v. Gallacher*, 722 F.3d 1257, 1264-65 (10th Cir. 2013)).

When a plaintiff's claim does not arise directly from a defendant's forum related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's contacts with the forum state.  *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–16 & n.9 (1984).  Here, the plaintiffs do not assert that general jurisdiction exists as to the defendants, and the Court will therefore determine only whether specific jurisdiction exists as to each defendant.

### B.    Constantia

Plaintiffs assert both tort and contract claims in this case.  As noted, in contract cases, courts often apply a purposeful availment test to determine whether the defendant "'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state," while courts in tort actions determine whether the defendant "purposefully directed" activities at the forum.  *Dudnikov*, 514 F.3d at 1071; *Niemi*, 770 F.3d at 1348.  Regardless of which test is applied here, the Court determines that Constantia has the necessary minimum contacts with Oklahoma and the requirements of the purposeful availment / direction tests are met such that the exercise of specific jurisdiction over Constantia is appropriate.

Constantia is an Austrian corporation in the flexible packaging business, with its principal place of business in Vienna, Austria. On May 15, 2012, Constantia's Chairman, Jan Homan, contacted Dickman in Tulsa to inquire about potentially acquiring Oracle from Pinnacle, which was the sole shareholder of Oracle. Pinnacle is an Oklahoma corporation with its principal place of business in Tulsa. Approximately 97% of Pinnacle's common stock and 99% of its preferred stock was owned by Oklahoma residents. (Doc. 57-1 at 9, ¶ 24). Pinnacle's general counsel, accountants, and advisers are in Tulsa, Oklahoma, and the common stock of Oracle was held by Pinnacle in Tulsa, Oklahoma. (*Id.* at 11, ¶ 34). While Oracle was a North Carolina company, Oracle's senior management and ownership was located in Tulsa, Oklahoma, and the acquisition of Oracle would be accomplished through a purchase of Oracle's common stock from Pinnacle. Dickman, an Oklahoma citizen, was the majority shareholder and chief executive of Pinnacle, and was Oracle's President, CEO, and Chairman. As part of the alleged fire sale, Pinnacle sold physical assets owned by Polo Road (from which Oracle leased a plant and manufacturing equipment). Polo Road is also an Oklahoma limited liability company.

After the initial contact with Dickman in Oklahoma, Homan subsequently emailed Dickman and proposed a meeting at Oracle's North Carolina plant to discuss the potential acquisition. Homan and von Hugo, who was a partner in One Equity Europe and a Vice Chairman of Constantia, met with Pinnacle officers at Oracle's facilities in North Carolina on June 21, 2012. After the June 21 meeting, von Hugo emailed Payne on July 4, 2012 and indicated that "[w]e have engaged Tom Blaige (of Blaige & Co.) to help us to proceed in the most expeditious manner." (Doc. 30 at ¶ 23). Dickman believed that Blaige was representing Constantia and One Equity Partners. (Doc. 57-1 at ¶ 9).

Blaige contacted Dickman in Tulsa to discuss a potential acquisition, and subsequently arranged a conference call for July 12, 2012 between Dickman in Tulsa, Unger in Europe, Blaige in Chicago, another Blaige employee in Atlanta, and Richard Kelsey, who was in Mexico. On July 13, 2012, Blaige and Kelsey met with Dickman and another Pinnacle shareholder from Tulsa in Houston, Texas. Blaige subsequently sent a nondisclosure agreement, which was prepared by Constantia, to Dickman in Tulsa for execution. On July 20, 2012, Blaige traveled to Tulsa to meet with Dickman and discuss "taking out" the Wells Fargo debt, Pinnacle's status with Centre Lane, and due diligence issues on the potential acquisition of Oracle by Constantia. While in Tulsa, Blaige and Dickman had a conference call with Unger and Kelsey to further discussions. Lynnwood Moore, a Tulsa attorney who acted as counsel for Pinnacle in Tulsa, was also involved in discussions with counsel for Constantia regarding a potential acquisition of Oracle and the refinancing of the Wells Fargo debt.

While certain relevant contacts occurred in Texas and North Carolina, and the parties' representatives were located around the world, Constantia knew that any acquisition of Oracle would involve purchasing stock from Pinnacle, an Oklahoma company. Constantia representatives also knew that Pinnacle was located in Tulsa, was principally operated and managed by Dickman, a Tulsa resident, and that any potential harm arising out of the parties' dealings would be felt by Pinnacle in Tulsa. According to the allegations of the Amended Complaint, Constantia also knew that the purchase or payoff of the Wells Fargo loan was of critical importance to Oracle, its shareholder Pinnacle, and Dickman and thus, that a failure to follow through with taking out that debt would cause harm to them. According to the plaintiffs, Constantia induced Pinnacle to forego its deal with Centre Lane as outlined in the July LOI, as a

condition to completing a transaction to acquire Oracle and "take out" the Wells Fargo debt, but did not do either.

In addition to the meetings in Oklahoma, North Carolina, and Texas, the parties' discussions regarding Oracle, Pinnacle and the Wells Fargo debt included numerous telephone calls, emails, and text messages, numerous of which were directed to Tulsa. Dickman provided an affidavit to which he attached a summary of those contacts and supporting documentation. The Court has reviewed both the summary and the underlying documentation, and they reveal significant contacts from representatives of Constantia directed to Dickman in Oklahoma. Those included numerous telephone calls to his cell phone, text messages to his cell phone, and emails to Dickman's email address at Pinnacle. (*See* Doc. 57-1 at 2, ¶ 4; *id.* at 14-47 and documents cited therein).

The Court finds that these facts satisfy the elements of purposeful direction to the forum, because the actions were intentional and were aimed at Oklahoma, with knowledge that the brunt of any injury would be felt in Oklahoma. *See Niemi*, 770 F.3d at 1348-49 (specific jurisdiction existed in suit against Austrian individual and foreign companies affiliated with him, where complaint alleged that the defendants promised loan proceeds to fund a large real estate development that failed when the loan proceeds were not forthcoming).

In addition, the foregoing establish that Constantia purposefully availed itself of the privilege of conducting activities in the forum state, as Constantia's representatives directly and intentionally engaged Pinnacle, an Oklahoma corporation, in Oklahoma for the purpose of engaging in a potential acquisition of another flexible packaging company, Oracle, which was owned solely by Pinnacle. Although it did not consummate the transaction with Pinnacle that was contemplated, its contacts with Pinnacle in Oklahoma were made directly by Constantia's

representatives and created a "substantial connection" with Oklahoma, and those were *not* merely "'random,' 'fortuitous,' or 'attenuated' contacts, or the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475. Plaintiffs have presented evidence sufficient to make a prima facie showing that Constantia purposefully directed activities at persons and entities connected to Oklahoma and that the litigation is the result of injuries that allegedly arose out of or related to those activities.

### C.      One Equity Europe

One Equity Europe is a German corporation headquartered in Frankfurt, Germany. Plaintiffs allege that von Hugo was acting not only on behalf of Constantia, but also on behalf of One Equity Europe. The Declaration of One Equity Europe's Managing Director states that von Hugo was an employee and Managing Director of One Equity Europe from May through August of 2012. (Doc. 53-3 at 4, ¶ 9). According to plaintiffs, von Hugo was acting on behalf of both One Equity Europe and Constantia in his dealings with Pinnacle, Oracle, and Dickman. (*See* Doc. 30 at ¶ 21; *see also* Doc. 57-2 at 23). One Equity Europe argues that plaintiffs have not "establish[ed] that: von Hugo was acting on behalf of [One Equity Europe]; or (ii) such alleged contacts constitute purposeful availment." (Doc. 53 at 21). In response, plaintiffs have provided an affidavit of Dickman, who stated that he at all times believed that von Hugo was acting on behalf of One Equity, and numerous documents in support of his belief. (Doc. 57-1).

The Court has reviewed the record presented by the plaintiffs and the defendants. The defendants argue that the plaintiffs' complaint "is devoid of any allegations that any employee of any Defendant ever indicated to Plaintiffs that von Hugo was acting on behalf of [One Equity Europe] in connection with the potential purchase of Oracle." (Doc. 53 at 21). In response, plaintiffs have presented documents which support plaintiffs' contention of One Equity

involvement. While the parties have presented conflicting views of the evidence with respect to One Equity's involvement, at this stage of the case, the Court must resolve any factual disputes in favor of the plaintiffs. *See OMI Holdings*, 149 F.3d at 1091; *Taylor*, 912 F.2d at 431. The evidence includes the following:

- On May 25, 2012, early in the discussions regarding Oracle, Homan emailed Dickman regarding Homan's plan for the visit to Oracle's North Carolina facilities to engage in "[f]urther discussion on possible Joint Venture in whatever form." Homan specifically confirmed that he had represented von Hugo to be Management Partner of One Equity Partners: "Christopher von Hugo, as I mentioned to you Management Partner of OEP (the Private Equity Fund of JP Morgan) and myself will come to see you." (Doc. 57-2 at 8).

- Oracle representative Chris Payne summarized the meeting with Homan and von Hugo: "Jan [Homan] was President of Constantia for 20 years prior to stepping down as President and focusing exclusively on the sell to One Equity and global growth initiatives. Jan was joined by Chris Von [sic] Hugo, Partner, One Equity Partners Europe, a division of JP Morgan Chase and is based in Frankfurt. Chris is also the Vice Chairman of Constantia and was the principal responsible for buying Constantia in 2009." (Doc. 57-2 at 23).

- When communicating by email, von Hugo utilized his address at "oneequity.com," rather than an email associated with Constantia. (*See, e.g.,* Doc. 57-2 at 11-12, 32-34, 391, 393-394, 402, 405-406, 421-424, 427, 429, 434, 477-478, 480, 484, 486-488, 511, 514).

- Communications between Dickman and representatives of the defendants also support plaintiffs' assertion of involvement by One Equity. (*See, e.g.*, Doc. 57-2 at 14 [Dickman email to Blaige: "It would be my thought that we talk specifically about the logistics of buying the debt from Wells [Fargo]. I suspect they would use One Equity or JP Morgan or someone to do that."]; *see also id.* at 46 [Dickman email to Blaige]: "Wells [Fargo] will want an offer letter and information about the buyer. Unless we are going to use a bank to do this. Obviously, they would be comfortable working with One Equity or JP Morgan."; *id.* at 112, 123 [In July 12, 2012 call, Constantia's CEO, Unger, indicates that the Wells Fargo loan takeout may include use of JP Morgan or OEP and states that he would need to talk to von Hugo about whether JP Morgan "can give us some support"]; *id.* at 252-253 [At the July 13, 2012 Houston meeting, the parties discussed engagement of legal counsel in connection with a potential deal, and Richard Kelsey (head of mergers and acquisitions at Constantia) indicated that the parties would use Freshfields, a European law firm with a presence in New York, "because they know OEP and they know Constantia" and "they have a very good relationship with Chris [von] Hugo, which helps."]; *id.* at 396 [Dickman email copied to Blaige stating that "Chris [von] Hugo who is the head of One Equity and owner of Constantia ... is the one that I have learned that Tom Blaige is calling on behalf of to try to schedule a call with Wells"; *id.* at 477 [Dickman July 31, 2012 email to von Hugo, Unger, Blaige, and the parties' legal counsel: "[Wells Fargo attorneys] emphatically said they had no desire to accept One Equity's offer nor entertain a higher waiver fee for a shorter period."]).

- Although Blaige's engagement letter was signed by Constantia, Blaige made references suggesting the involvement of One Equity in Blaige's contacts directed at Pinnacle and Dickman in Oklahoma. (*See, e.g.,* Doc. 57-2 at 56 [Blaige email to Dickman: "I do not have copies of the Confidential Memorandum on Oracle (others at Constantia *and OEP* have it under a signed CA) so could we get that along with interim financials and updated EBITDA figures?"]; *id.* at 257 [At July 13, 2012 Houston meeting, Blaige stated that "Richard [Kelsey] had mentioned to me ... that what *OEP and* Constantia have is a, sort of a downsided case, a base case and an upsided case...."]).

As with Constantia, the record reveals significant, purposefully directed contacts from von Hugo to Oklahoma, and a number of communications with Constantia representatives, including Homan, Unger, Kelsey, and Blaige, as well as von Hugo himself, generally support plaintiffs' assertion that von Hugo was acting on behalf of One Equity Europe in his numerous contacts with Dickman and Pinnacle.

### D. One Equity LLC

One Equity LLC is a Delaware limited liability company with its principal place of business in New York, New York. (Doc. 53-2 at 3, ¶ 3). One Equity LLC submitted the Declaration of Judah A. Shechter, Vice President and Secretary of One Equity LLC. In the affidavit, Shechter stated that "von Hugo has never been employed by [One Equity LLC], he has never been an officer or director of [One Equity LLC], and he has not acted on [its] behalf in respect of the matters set forth in the Complaint." (*Id.*, ¶ 9). Shechter also stated that no other person identified in the complaint was an employee, officer, or director of One Equity LLC, or was acting on its behalf with respect to the matters in the complaint. (*Id.*). In addition, One

Equity LLC "does not directly or indirectly own any part of Constantia Flexibles GmbH, an Austrian GmbH." (*Id.* at ¶ 10). In response, plaintiffs have provided a few printouts from the Internet that may suggest that von Hugo was an agent for multiple One Equity entities. (*See* Doc. 57-4 at 8, 10, 12). While those printouts reference "OEP" generally, they do not (a) indicate that von Hugo was employed by One Equity LLC, (b) refute the statements in Shechter's Declaration, or (c) establish that von Hugo's contacts with the plaintiffs were on behalf of One Equity LLC. (*See id.*). Indeed, plaintiffs' own summary of the first meeting in North Carolina with Homan and von Hugo described von Hugo as being associated with "One Equity Europe, a division of JP Morgan Chase [which] is based in Frankfurt." (Doc. 57-2 at 23).

While the record of communications between the parties in this case also includes a number of references to "OEP" or "One Equity," those general references do not support an exercise of personal jurisdiction over every entity with those terms in its name. In addition, such references do not make von Hugo an agent of One Equity LLC, when the record has established that he was not an employee, officer, director, or agent of One Equity LLC. The Court concludes that there is no basis for an assertion of personal jurisdiction over One Equity LLC. Accordingly, One Equity LLC's motion to dismiss under Fed. R. Civ. P. 12(b)(2) is **granted**. References hereafter to "defendants" do not include One Equity LLC.

### E. Traditional Notions of Fair Play and Substantial Justice

Having determined that Constantia and One Equity Europe had minimum contacts sufficient for the exercise of personal jurisdiction, the Court "must still inquire whether the exercise of personal jurisdiction would 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1080 (citations omitted). "Defendants that 'purposefully directed [their] activities at' the forum state can defeat personal jurisdiction only by 'present[ing]

a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Niemi*, 770 F.3d at 1350 (quoting *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005)) (internal citation omitted). Courts typically consider a number of factors, such as "(1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states [or foreign nations] in furthering fundamental social policies." *Dudnikov*, 514 F.3d at 1080 (bracketed language in original) (quoting *OMI*, 149 F.3d at 1095).

These factors do not weigh definitively in favor of the defendants. The burden on the defendants, foreign entities, of having to litigate in the United States may be significant. However, in their dealings with Pinnacle, the defendants utilized representatives in Chicago, Illinois (Blaige) and New York (Freshfields) because of their presence in the United States, Kelsey met with Dickman in Houston, Texas, Blaige met with Dickman in Tulsa, Oklahoma, and Homan and von Hugo demonstrated their ability to travel to the United States to engage in discussions with Pinnacle / Oracle representatives in North Carolina. As noted, in addition to the meeting in Tulsa, the defendants directed numerous calls, text messages, and email communications to Dickman in Tulsa, Oklahoma. The parties have not identified any meetings between the parties in Austria or Germany.

While the defendants assert that plaintiffs' allegations "concern events that took place primarily in Austria, Germany, New York, North Carolina and Texas," that contention ignores the numerous contacts with Oklahoma. The facts summarized above indicate that the center of the dispute as framed by plaintiffs' Amended Complaint involved (1) the acquisition of the

common stock of Oracle, which was owned entirely by Pinnacle, an Oklahoma entity, and (2) the refinance (by purchase or payoff) of the Wells Fargo loan, on which Oracle, Pinnacle, and Dickman were considered borrowers and Pinnacle and Dickman, both Oklahoma domiciliaries, were guarantors. There is no question but that the brunt of any alleged damages as a result of Wells Fargo's freezing of Oracle's assets and ability to continue business and the resulting "fire sale" of Oracle's common stock and the plant and manufacturing equipment which it leased from Polo Road would be sustained in Oklahoma. While the Oracle plant was located in North Carolina, Oracle is no longer owned by any of the parties to this litigation, and the plant itself is not at issue in light of the fact that the defendants did not consummate the transaction to acquire Oracle. The Wells Fargo debt was administered out of Texas, but Wells Fargo is not a party to this action, whereas borrowers and guarantors, Pinnacle and Dickman, in Oklahoma, are parties.

The plaintiffs' interest in obtaining relief strongly favors Oklahoma as the forum. In summary, the Court does not find that defendants have presented a compelling case that exercise of jurisdiction would be unreasonable. *See Pro Axess*, 428 F.3d at 1279-81 (finding due process, traditional notions of fair play and substantial justice were not offended by Utah court's exercise of jurisdiction over a French company where, *inter alia*, the company chose to do business with a Utah resident and litigating in France would impose a difficult hardship upon the plaintiff).

Accordingly, the motion to dismiss Constantia and One Equity Europe for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) is **denied**.

## III.    Failure to State a Claim

### A.    Standards

In considering a Rule 12(b)(6) dismissal motion, a court must determine whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). The

Rules require "a short and plain statement of the claim to show that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The standard does "not require a heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id*. at 555-56, 570 (citations omitted). "Asking for plausible grounds ... does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563.

*Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to the claimant. *See Twombly*, 550 U.S. at 555; *Alvarado v. KOB–TV, L.L.C*., 493 F.3d 1210, 1215 (10th Cir. 2007).

**B.     Claims against One Equity Europe**

One Equity Europe argues that plaintiffs have failed to connect One Equity Europe to any of the alleged wrongdoing asserted in the Amended Complaint. As alleged in the Amended Complaint, on Homan's very first call to Dickman about a potential acquisition of Oracle, Homan indicated that von Hugo, a Managing Director of One Equity Europe, would be traveling

with Homan to the meeting at Oracle's facilities.  Homan confirmed the same in an email to Dickman.  Mr. von Hugo had numerous contacts with plaintiffs and their representatives.  In addition, the same facts set forth above with respect to One Equity Europe's minimum contacts with Oklahoma generally support plaintiffs' allegations with respect to One Equity Europe's involvement in the conduct supporting plaintiffs' claims.  The allegations of the Amended Complaint indicate that One Equity Europe, and in particular von Hugo on its behalf, would necessarily be involved in the promised refinancing of the Wells Fargo debt.  At the pleading stage, the allegations of the Amended Complaint, taken as true, facially implicate One Equity Europe in the conduct which allegedly harmed plaintiffs.

### C.    Tortious Interference Claims

Defendants argue that the plaintiffs have failed to state a claim for tortious interference. In the Amended Complaint's First and Fourth Claims for Relief, plaintiffs assert a claim for interference with "contractual performance or prospective contractual relations."  (Doc. 30 at 20, 24).   However, in response to the dismissal motion, plaintiffs addressed only a claim for interference with "prospective contractual relations," and they did not respond to the defendants' argument that no claim for interference with an existing contract could be maintained.  (*See* Doc. 57 at 38-39).  Accordingly, the Court construes plaintiffs' tortious interference claims as being limited to claims for interference with prospective contractual relations.

Oklahoma has adopted the Restatement (Second) of Torts as to tortious interference claims.  *See Wilspec Techs., Inc. v. DunAn Holding Grp. Co.*, 204 P.3d 69, 70-71 (Okla. 2009). The Restatement recognizes a claim for interference with prospective contractual relations not yet reduced to a contract.  *Id.* at 71; Restatement (Second) of Torts § 766B.  For a claim of interference with prospective relations, plaintiff must allege (1) the existence of a valid business

relation or expectancy, (2) knowledge of the relationship or expectancy on the part of the interfering party, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship has been disrupted. *See Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1287 (10th Cir. 2012) (citing *Boyle Servs., Inc. v. Dewberry Design Grp, Inc.*, 24 P.3d 878, 880 (Okla. Civ. App. 2001)).

The Amended Complaint alleges facts which satisfy the above elements. The valid relation or expectancy is established by plaintiffs' allegations as to the Letters of Intent with Centre Lane and allegations that, if a deal on the expected terms outlined in the July LOI had been consummated with Centre Lane, plaintiffs would have completed a deal worth $18,000,000 more than the "fire sale" terms they were forced to accept. (Doc. 30 at ¶¶ 12, 15, 40, 42). Plaintiffs have also alleged that the defendants had knowledge of the relationship and expectancy. (*See, e.g., id.* at ¶¶ 30-35). Plaintiffs factual averments, taken as true, plausibly allege an intentional interference by the defendants, which induced or caused a termination of the relationship or expectancy. Plaintiffs allege that the defendants required and funded the settlement with Centre Lane which extinguished any obligation of Centre Lane to consummate a transaction as expected under the July LOI. (*Id.* at ¶¶ 32-33, 36-37, 44-47). The Amended Complaint also includes allegations sufficient to identify resultant damage to the plaintiffs.

Defendants argue that the plaintiffs have not adequately alleged malice. While a tortious interference claim requires proof of "malicious" conduct, "'malice' is defined as 'an unreasonable and wrongful act done intentionally, without just cause or excuse.'" *Yousuf v. Cohlmia*, 741 F.3d 31, 42, n.3 (10th Cir. 2014) (quoting *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 654 (Okla. 1990)). Plaintiffs note that they specifically alleged that defendants acted "intentionally and with malice." (Doc. 30 at ¶¶ 49, 60). Moreover, the

plaintiffs alleged plausible facts which, taken as true at this stage, are sufficient to satisfy the definition of malice. (*See id.* at ¶¶ 16-19, 22, 26, 29-30, 33-43).

Defendants also argue that plaintiffs have not adequately alleged proximate causation. Normally, proximate causation is a fact issue to be determined by a jury. *Jones v. Mercy Health Ctr., Inc.*, 155 P.3d 9, 14 (Okla. 2006). In the Amended Complaint, plaintiffs allege that they would not have been injured "but for Defendants' express assurances to Pinnacle that they would follow through with the commitments ...." (Doc. 30 at ¶ 45). In addition, plaintiffs set forth a series of allegations that defendants' failure to honor their promises to either pay off or purchase the Wells Fargo debt caused significant damages to the plaintiffs because, had plaintiffs known that the defendants would not take out the Wells Fargo debt, Pinnacle would not have executed the settlement agreement with Centre Lane, but would have instead performed the deal with Centre Lane under the terms of the July LOI. (*Id.* at ¶ 40). At the pleading stage, the Court concludes that plaintiffs have sufficiently alleged causation.

Defendants further contend that the plaintiffs' allegations of interference are insufficient to state a claim for tortious interference. As noted above, Oklahoma law requires allegations which, if true, would establish an intentional interference inducing or causing a termination of the relationship or expectancy. *See Cohlmia*, 693 F.3d at 1287. The Restatement provides that "[o]ne who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third party not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Restatement (Second) of Torts § 766B. The Amended Complaint contains allegations that the defendants "directly induced Centre Lane to

24

abandon Centre Lane's contract rights to acquire Oracle, and the latter's contract obligations to Pinnacle, by wiring an agreed sum on July 30, 2012." (Doc. 30 at ¶ 44). Plaintiffs have also averred that, as a condition to moving forward with the Wells Fargo refinancing, the defendants demanded that Pinnacle enter into the agreement with Centre Lane to terminate the July LOI. (*See id.* at ¶ 32). Taken as true at the pleading stage, the Court finds that these allegations are sufficient to state a plausible claim for interference with prospective relations, and the motion to dismiss is **denied** as to plaintiff's interference claims.

### D.      Breach of Contract Claim

In the Second Claim of the Amended Complaint, Pinnacle asserts a breach of contract claim against the defendants. (Doc. 30 at 22). To state a claim for breach of contract under Oklahoma law, a plaintiff must allege the formation of a contract, breach of the contract, and damages as a direct result of the breach. *See Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001). According to the defendants, the allegations of the Amended Complaint are contradictory and too indefinite to identify a valid contract, because Pinnacle did not identify the terms of the promised refinancing of the Wells Fargo loan. (Doc. 53 at 35-37; *see also* Doc. 62 at 21-24). Oklahoma law disfavors voiding contracts for vagueness or indefiniteness. *See Expertise, Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 971 (10th Cir. 1987).

Pinnacle alleges that there was an oral agreement that, following the settlement with Centre Lane and termination of the July LOI, the defendants would "either (a) pay off the Wells Debt (which debt equaled approximately $19 million) and provide a new loan to Oracle, or (b) purchase the Wells Debt from Wells." (Doc. 30 at ¶ 33). In addition, according to Pinnacle, the contract included an agreement that "Constantia would acquire Oracle for a consideration consisting of, among other things, (i) payment of an amount equal to the total of the Incentive

Payment plus $8.5 million, (ii) an 'earn-out' that would be structured for a payment to the shareholders based on future performance of Oracle, and (iii) execution of a one-year consulting agreement between Dickman and Constantia." (*Id.* at ¶ 35). Plaintiffs also assert in paragraph 33 of the Amended Complaint that, in the event the sale of Oracle was never consummated, the defendants "would remain as Oracle's lender until such time as Oracle could arrange permanent financing from an institutional or other lender." (*Id.* at ¶ 33). According to plaintiffs, Pinnacle's settlement with Centre Lane was a condition of the agreement. (*Id.* at 32; *see* Doc. 57 at 44).

At this stage of the litigation, the standard is whether Pinnacle has provided enough allegations to state a claim plausible on its face, and the Court concludes that Pinnacle has stated a plausible claim. Nearly every one of the cases upon which defendants rely was decided on evidence, rather than at the pleading stage. For example, *In re Moore Med. Ctr.*, No. CIV-09-1331-M, 2010 WL 3366411 (W.D. Okla. Aug. 3, 2010) (unpublished) was decided on an appeal from a bankruptcy court's findings upon an evidentiary record, and *Firstul Mortg. Co. v. Osko*, 604 P.2d 150 (Okla. Civ. App. 1979) was also decided on an evidentiary record. *Expertise, Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 971 (10th Cir. 1987) involved an appeal following a jury trial. Two of the decisions, which were state courts outside of Oklahoma, *Key v. Naylor, Inc.*, 268 Ga. App. 419 (Ga. Ct. App. 2004) and *Am. Nat'l Ins. Co. v. Noble Comm., Inc.*, 936 S.W.2d 124 (Mo. Ct. App. 1996), were decided at the summary judgment stage. While *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997) involved a dismissal, the dismissal was based upon the statute of frauds, which applied to the contract for sale of an interest in real estate which was involved in that case, and involved only a question of law. The defendants have not here argued for dismissal based upon the statute of frauds.

The motion to dismiss the breach of contract claim is **denied**.

### E.    Fraud Claim

Pinnacle has asserted a fraud claim against the defendants.  Defendants first argue that the claim should be dismissed under Fed. R. Civ. P. 9(b), which requires that circumstances constituting fraud must be stated "with particularity," because Pinnacle has not alleged the specifics of the alleged fraud separately as to Constantia as distinct from One Equity Europe. Pinnacle has alleged that those defendants participated jointly in the purported fraud and that Constantia and One Equity Europe were acting jointly in all of their dealings with the plaintiffs. (Doc. 30 at ¶ 6).  The Amended Complaint contains numerous specific allegations with respect to representations at the outset of the discussions between the parties which could be construed to support plaintiffs' assertion that One Equity Europe was involved in the communications and dealings of the parties.

Under Oklahoma law, "fraud is a generic term embracing the multifarious means which human ingenuity can devise so one can get advantage over another by false suggestion or suppression of the truth."  *Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1045 (Okla. 2013).  "When fraud is alleged, every fact or circumstance from which a legal inference of fraud may be drawn is admissible."  *Id.*  Actual fraud is "the intentional misrepresentation or concealment of a material fact, with an intent to deceive, which substantially affects another person."  *Id.* Constructive fraud "is a breach of a legal or equitable duty to the detriment of another, which does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose." *Id.* at 1045-46.

The Amended Complaint alleges a plausible fraud claim under Oklahoma law.  Pinnacle alleges that the defendants "expressly represented to Pinnacle management that the Wells [Fargo] Refinancing would be completed immediately following the settlement payment wired to

Centre Lane on July 30, 2012," that the representation "was false or was a representation made without any then-present intent to fulfill the same," and that defendants "knew of the falsity of the statement or knew that they had no actual intention to follow through with the Wells Financing." (Doc. 30 at ¶ 53). Pinnacle also alleges that the defendants intended for Pinnacle to rely on the statement and insisted on Pinnacle's execution of the settlement agreement with Centre Lane as a condition to completion of the refinancing, and that, in executing the settlement with Centre Lane and abandoning its rights under the July LOI with Centre Lane, Pinnacle relied upon the defendants' false representations. (*Id.* at ¶ 54). Pinnacle also alleges damages suffered as a result of the alleged fraud. (*Id.* at ¶ 55). These allegations, taken as true, satisfy the elements of a fraud claim and sufficiently state a plausible claim. While the Court recognizes that there is some overlap between the fraud and contract claims asserted by Pinnacle, pleading both theories at this stage is permissible in light of the fact that the existence of an actual contract is disputed. The motion to dismiss the fraud claim is **denied**.

## IV.    Defendants' Unclean Hands Argument

Defendants' final argument for dismissal is that the plaintiffs should be prohibited from maintaining this action because they "have unclear hands." (Doc. 53 at 34). They cite one case in support of their argument. In that case, the plaintiffs were illegal immigrants who admitted that they violated federal law and asked the district court to allow them to file suit anonymously in order to avoid detection by federal law enforcement agencies. *National Coalition of Latino Clergy, Inc. v. Henry*, No. 07-CV-613-JHP, 2007 WL 4390650, at *9 (N.D. Okla. Dec. 12, 2007). That case has no similarity to the issues now before this Court. In any event, the plaintiffs deny that they breached the earlier exclusivity agreement with Centre Lane or otherwise acted unconscionably or illegally, and the Court determines dismissal based upon an

affirmative defense of unclean hands, upon which defendants will ultimately bear the burden of proof, is inappropriate at the pleading stage.

**V.      Conclusion**

Defendants' motion to dismiss (Doc. 53) is **granted in part and denied in part**, as set forth above.  Defendant One Equity Partners LLC is hereby **dismissed** and terminated as a party, as the Court lacks personal jurisdiction over it.

SO ORDERED this 23rd day of December, 2014.

_____
JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE