# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

PINNACLE PACKAGING COMPANY,           )
INC., an Oklahoma corporation,        )
POLO ROAD LEASING, LLC, an Okla-      )
homa limited liability company, and   )
J. SCOTT DICKMAN,                     )
                                      )
       Plaintiffs,               )
                                      )
    vs.                        )    Case No. 12-CV-537-JED-TLW
                                      )
CONSTANTIA FLEXIBLES GmbH, an         )
Austrian corporation,  and            )
ONE EQUITY PARTNERS (EUROPE) GmbH,    )
                                      )
       Defendants.               )

---

## OPENING REDACTED BRIEF OF PLAINTIFFS IN SUPPORT OF THEIR MOTION TO APPLY CRIME FRAUD EXCEPTION TO CLAIMS OF PRIVILEGE BY DEFENDANTS AND FOR OTHER RELIEF ON CLAIMS OF PRIVILEGE

---

        s/ Laurence L. Pinkerton
        Laurence L. Pinkerton, Esq. (OBA #7168)
        PINKERTON LAW, P.C.
        Penthouse Suite
        15 E. 5th Street
        Tulsa, Oklahoma 74103-4303
        (918) 587-1800
        (918) 582-2900 fax
        pf@att.net
        Attorney for Plaintiffs

August 7, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     VERIFIED FACTUAL STATEMENT OF PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . 1

II.    THE CRIME FRAUD EXCEPTION APPLIES TO THE PRIVILEGE CLAIMED
      BY DEFENDANTS RELATED TO THEIR FRAUDULENT SCHEME FOR THE
      CENTRE LANE SETTLEMENT AND THE WELLS FARGO DEBT EXTENSION
      AS OPPOSED TO PURCHASE (PAY OFF) OF THE WELLS DEBT . . . . . . . . . . . . 14

      A.    Oklahoma Law Supplies the Rule of Decision in this Case, Therefore, its
            Crime Fraud Exception Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    The fraud claim is governed by Oklahoma law . . . . . . . . . . . . . . . . . . . . 15

            2.    Oklahoma's crime fraud exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    A Sufficient *Prima Facie* Case of Fraud Exists Such That the Crime Fraud
            Exception Should Be Invoked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.   ALL REDACTIONS THAT IN ANY WAY MAKE REFERENCE TO OEP, ONE
      EQUITY PARTNERS (EUROPE), OR ONE EQUITY PARTNERS LLC, OR
      CLAIMS OF PRIVILEGE RELATED THERETO, ARE ALSO SUBJECT TO THE
      CRIME FRAUD EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

**Cases**

*Boyd Rosene &Associates, Inc. v. Kansas Municipal Gas Agency,*
    174 F.3d 1115 (10th Cir. 1999) ............................................... 15

*D & H Co., Inc. v. Shultz, Okl.,* 579 P.2d 821 (1978) ................................. 16

*Graves v. Mazda Motor Corporation,* 598 F.Supp.2d 1216 (W.D. Okl. 2009) ............. 15

*See In re Grand Jury Investigation (Schroeder),* 842 F.2d 1223, 1226 (11th Cir. 1987) ...... 18

*In re Grand Jury Proceedings (Doe),* 102 F.3d 748, 749-51 (4th Cir. 1996) ............... 18

*In re Grand Jury Proceedings (Vargas),* 723 F.2d at 1467 ............................. 18

*In re Grand Jury Subpoenas,* 144 F.3d 653 (10th Cir. 1998) .......................... 18

*In re Richard Roe, Inc.,* 68 F.3d 38, 40 (2d Cir. 1995) ................................ 18

*Keller v. State,* 651 P.2d 1339, 1342 (Okl.Crim.App. 1982) ........................... 16

*Silk v. Phillips Petroleum Co.,* 1988 OK 93, 760 P.2d 174 ........................ 16, 18

*State ex rel., Southwestern Bell Telephone Co. v. Brown,* Okl., 519 P.2d 491 (1974) ........ 16

*Uptegraft v. Dome Petroleum Corp.,* 764 P.2d 1350 (Ok. 1988) ........................ 17

*White v. American Airlines, Inc.,* 915 F.2d 1414 (10th Cir. 1990) ...................... 16

*Wright v. Trinidad Drilling, LP,* 2010 WL 3212732 .................................. 15

**Statutes**

12 O.S. § 502(D)(1) ................................................................ 16

Plaintiffs, Pinnacle,[1] Polo Road, and Dickman (collectively, "Plaintiffs"), hereby provide Their *Opening Brief of Plaintiffs in Support of Their Motion to Apply Crime Fraud Exception to Claims of Privilege by Defendants and for Other Relief on Claims of Privilege*.

## I.  VERIFIED FACTUAL STATEMENT OF PLAINTIFFS.

Pinnacle is a Tulsa based privately held company which has approximately 25 Tulsa shareholders. Polo Road, is a separately owned private entity with slightly different ownership from Pinnacle. Polo Road owned equipment that was used by Oracle, which was a wholly owned subsidiary of Pinnacle. All three of these entities during the relevant period were managed by Plaintiff, J. Scott Dickman ("Dickman"), who acted as their President.

Oracle was a well respected manufacturer of packaging products that was based in Winston-Salem, North Carolina. It also owned and used an aluminum casting mill referred to as the "Phoenix Mill." Oracle, Pinnacle, and Dickman became borrowers on a line of credit and equipment loan with Wells Fargo Bank, N.A. ("Wells Debt" and "Wells") that related to Oracle's operations. Financial difficulties of Oracle caused Wells on July 9, 2012, to make demand for full payment of the Wells Debt that approximated $18 million no later than July 31, 2012.[2]

The Plaintiffs' alleged injuries and damages are premised on their not completing the sale of Oracle to a New York based private equity firm, Centre Lane Partners LLC ("Centre Lane"), as envisioned in a Letter of Intent, dated July 4, 2012, and as amended on July 9, 2012 (the "LOI"). The closing of this sale was to occur on July 31, 2012, and result in a payoff of the Wells Debt. Following execution of the LOI, the parties moved to close the transaction through the development in July, 2012 of a draft contract signed by Centre Lane.

---

[1]  Terms defined in the Motion are used herein.

[2]  See Exhibit 49.

In the midst of this sale transaction, and with the Wells Fargo demand for payment outstanding, Defendant, Constantia, a large international manufacturer of packaging products, and Defendant, One Equity Partners (Europe) GmbH ("One Equity (Europe)"), a private equity firm, contacted Pinnacle's management, and pursued their own acquisition of Pinnacle through negotiations with Dickman. These negotiations focused primarily on securing a purchase of the Wells Debt on or before July 31, 2012, to enable due diligence to continue on an acquisition. Pinnacle and its counsel gave express warnings that any attempt to obtain a discount from Wells would be unavailing.

Dickman was the principal negotiator for Pinnacle, Polo Road, and himself. The principal in the negotiations for Constantia was an Austrian citizen, Thomas Unger ("Unger"), who was Chief Executive Officer of Constantia. Exhibit 44, p. 3. The alleged principal for One Equity Partners (Europe) was a German citizen, Christopher von Hugo ("von Hugo").[3] (Plaintiffs believe a further entity, One Equity Partners, LLC, was also involved and represented by von Hugo.) Defendants were also represented by an agent, Thomas E. Blaige ("Blaige") of Thomas E. Blaige & Company. Exhibit 7, Affidavit of Gabrielle Gould and email of von Hugo.[4]

Plaintiffs' alleged fraudulent misrepresentations and omissions are:[5]

---

[3] Von Hugo was a Managing Director of One Equity (Europe) during the relevant period. Exhibit 52, Supplemental Response to Interrogatory No. 1. He also was a member of the Supervisory Board of Constantia. Exhibit 44, p. 3; Exhibit 52, Interrogatory No. 4.

[4] The above initial portion of the Verified Factual Statement is sworn to by the Affidavit of J. Scott Dickman (the "Dickman Affidavit") filed herein on September 13, 2013 [DKT 95-1], wherein Dickman states the Amended Complaint [DKT 30] is true and correct with certain exceptions. Dickman Affidavit, ¶ 3.

[5] The statement below in paragraphs (1) through (4) is the supplemental response to Interrogatory No. 4 verified by Dickman in Exhibit 55.

(1)     Von Hugo, in a conference call on July 24, 2012, with Dickman, and others, in referring to the requested purchase of the Wells Debt on or before July 31, 2012, and the potential of proceeding to go forward with an acquisition of Oracle and Polo Road, made a misrepresentation by stating:

> . . . either, its uh uh uh either the situation where we say, well, we can't or we can, and if we can, we'll come back full steam, and if we can't, we'll just candidly tell you, Scott, and, uh, and then, uh, see what happens then.

(2)     In the same telephone call as in (1), above, Scott Dickman stated,

> We sent a letter from Centre Lane to you all that gives us permission to talk about refinancing. Oh, uh, so, all of your questions about the company would be in light of buying the financing.

To this Christopher von Hugo responded:

> . . . but, but, Centre Lane would go batshit if they knew it was the private equity activities of JP Morgan.

This representation related to the entity for whom von Hugo was acting, which was perceived to be One Equity Partners, as this was originally represented to Dickman in an email from Constantia's Jan Homan,[6] dated May 25, 2012, in which he identified von Hugo as, "Management Partner of OEP (the Private Equity Fund of JP Morgan)."[7] This representation coincided with a representation made by Blaige, who was an agent for Constantia and believed to be an agent for the entity represented by von Hugo, in a meeting in Houston, Texas on July 13, 2012 attended by Chris Payne of Oracle, Dickman, Blaige, Richard Kelsey ("Kelsey"), Merger and Acquisition Manager of Constantia, and

---

[6] Jan Homan was Supervisory Board Chairman of Constantia. Dickman Affidavit [DKT 57-1] ¶ 10.

[7] Constantia was 75% owned by One Equity Partners, Exhibit 44 (fourth bullet point). One Equity Partners was a subsidiary of JP Morgan, Chase & Co., Exhibit 53 [DKT 20]. One Equity (Europe) was an indirect subsidiary of JP Morgan & Co., Exhibit 54, verified Response to Interrogatory No. 2.

Frank Murphy, a Pinnacle shareholder, in which Kelsey made the representation in reference to the law firm of Freshfields [Bruckhaus Derringer US LLP]: "Because they know OEP and they know Constantia." To this Blaige made the representation (emphasis added):

> The other thing that Thomas [Unger], uh, Richard [Kelsey] had mentioned to me is, uh, that what **OEP** and Constantia have is, sort of a downside case, a base case and an upside case, . . .

Each of the Defendants now denies that there was any participation by One Equity Partners (Europe) or by One Equity Partners, LLC in the negotiations undertaken by Plaintiffs with Constantia in July, 2012.[8] Consequently, all of the above representations by von Hugo, Homan, Kelsey, and Blaige are misrepresentations.[9]

    (3)    Unger in a telephone conference call on July 25, 2012, participated in by Blaige, Dickman, and Hank Bird, stated that if Plaintiffs secured a full release from CLP LLFLEX Holdings, LLC ("Holdings") and Centre Lane Partners, LLC ("CLP"), for any and all claims and counterclaims asserted in litigation then pending in Delaware and from any obligations to proceed further with a purchase of the stock of Pinnacle and/or Oracle by CLP and/or Holdings, and to facilitate the Plaintiffs's efforts to secure a settlement agreement and a release, Constantia, and One Equity Partners (Europe) and whatever additional One Equity Partners entity von Hugo represented, would lend Oracle up to $6 million to be used for the sole purpose of reaching a settlement with Holdings and CLP and to terminate any exclusivity period that remained, and to provide an incentive for a

---

[8] See interrogatory responses attached to the Confidential Filing as Exhibit 51 for Constantia at verified Interrogatory Nos. 9-12 , and Exhibit 52 for One Equity Partner (Europe) at verified Interrogatory Nos. 4, 7, and 8.

[9] The lack of participation by One Equity Partners LLC is directly contradicted by the privilege log of One Equity Partners LLC, Exhibit 3, which repeatedly lists Judah Schechter, Esq., who was a Vice President and Secretary of One Equity Partners, LLC. Exhibit 56.

settlement less than the $6 million offered, Pinnacle would retain half of the difference as additional consideration, and if this condition was performed, then Constantia and One Equity (Europe) and whatever additional One Equity Partners entity von Hugo represented, would purchase the outstanding loan of Pinnacle, Oracle, and Dickman (the aforesaid "Wells Debt") from Wells at par on or before July 31, 2012, and provide interim financing on terms no worse than those in the Wells Debt, and further, in the event an agreement to purchase Pinnacle's flexible packaging business was not ultimately reached, Pinnacle and Oracle would be given a reasonable amount of time or within six months to place the Wells Debt with another institution. The split of the difference and the purchase of the Wells Debt were both false.

(4)     The Defendants omitted to inform the Plaintiffs of their intention to contact Wells and state that they would pay a $1 million fee for a 45-day extension on the due date of the Wells Debt, and would grant to Wells an opportunity to participate in the underwriting of the acquisition of Global Pak, and that Wells could serve as a registered agent resulting in a merger and acquisition fee on other potential transactions in the United States.

This contact with Wells did occur on July 31, 2012, through a letter from Constantia to Wells, Exhibit 44, and through a telephone call on the same day by "One Equity" and Constantia as shown by a Wells' memorandum on the telephone call, Exhibit 45. Neither communication addressed a purchase of the Wells Debt, but instead sought an extension of 45 days in exchange for $1 million and other consideration. Had Defendants (directly by management or indirectly through counsel or Blaige) given Plaintiffs so much as an inkling that Defendants would embark on this quixotic $1 million scheme with regard to the Wells Debt – let alone renege on its representation to Plaintiffs to take out the Wells Debt because its quest did not succeed – Pinnacle would not have

**REDACTED**

# REDACTED

# REDACTED

# REDACTED

# REDACTED

**REDACTED**

# REDACTED

# REDACTED

# REDACTED

II. THE CRIME FRAUD EXCEPTION APPLIES TO THE PRIVILEGE
CLAIMED BY DEFENDANTS RELATED TO THEIR FRAUDULENT
SCHEME FOR THE CENTRE LANE SETTLEMENT AND THE WELLS
FARGO DEBT EXTENSION AS OPPOSED TO PURCHASE (PAY OFF) OF
THE WELLS DEBT.

## A. Oklahoma Law Supplies the Rule of Decision in this Case,[12] Therefore, its Crime Fraud Exception Applies.

Rule 501 F.R.Evid. states:

> [I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Oklahoma law supplies the rule of decision on all claims in this action as shown previously [DKT 57]. Hereafter, Plaintiffs will show the application of Oklahoma's law on fraud.

### 1. The fraud claim is governed by Oklahoma law.

The choice of law analysis for a tort claim begins with a determination that it is substantive. *Boyd Rosene &Associates, Inc. v. Kansas Municipal Gas Agency*, 174 F.3d 1115, 1118 (10th Cir. 1999); *Wright v. Trinidad Drilling, LP*, 2010 WL 3212732, 1 (W.D. Okl.); *Graves v. Mazda Motor Corporation*, 598 F.Supp.2d 1216 (W.D. Okl. 2009). Fraud is clearly substantive.

Next, in the tort context, this Court must determine which state has the most significant relationship to the involved occurrence and the parties by considering four factors:

> (i) in the place where the injury occurred, (ii) the place where the conduct causing the injury occurred, (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (iv) the place where the relationship, if any, between the parties is centered.

*Graves, supra*, at 1218. Under each of these criteria, Oklahoma predominates, though it can be argued that Oklahoma figures along with other states in (ii) and (iii), but under (i) the injury occurred here as Pinnacle, Polo Road, and Dickman are residents, and under (iv), while there are occurrences in other states, Oklahoma predominates because of the initial contact in Oklahoma, and the multiple and significant contacts that are shown in the Summary and related documents filed in response to the motions to dismiss [DKT 57-1 through 57-4].

---

[12] If Oklahoma law does not apply, the crime fraud exception is commonly recognized.

### 2.    Oklahoma's crime fraud exception.

Given the application of Oklahoma law, the applicable crime fraud exception is embodied

in 12 O.S. § 502(D)(1):

> D.    There is no privilege under this section:
>
> 1.    If the services of the attorney were sought or obtained to enable or aid anyone
> to commit or plan to commit what the client knew or reasonably should have known
> to be a crime or fraud.

This exception should be applied as shown hereafter.

### B.    A Sufficient *Prima Facie* Case of Fraud Exists Such That the Crime Fraud Exception Should Be Invoked.

In *White v. American Airlines, Inc.*, 915 F.2d 1414, 1423 (10th Cir. 1990), the Tenth Circuit

stated:

> It appears that some type of prima facie showing of a crime or fraud is required under
> Oklahoma law in order to trigger the applicability of the crime-fraud exception. *See
> Keller v. State*, 651 P.2d 1339, 1342 (Okl.Crim.App. 1982).

In *White* the Tenth Circuit found a *prima facie* case based on an allegation by a discharged employee

that American Airlines' outside counsel had made requests for him to commit perjury and that the

outside counsel had met before the requests with an American Airlines Vice President. *Id.*, at 1424.

Unlike *White*, the instant case concerns common law fraud. The Oklahoma Supreme Court

has defined the necessary elements of such a claim:

> The elements of actionable fraud are that the defendant made a material
> representation that was false, that he knew when he made the representation that it
> was false, and that he made it with the intention that it should be acted upon by
> plaintiff, and that plaintiff acted in reliance upon it and thereby suffered detriment.
> *D & H Co., Inc. v. Shultz*, Okl., 579 P.2d 821 (1978); *State ex rel., Southwestern Bell
> Telephone Co. v. Brown*, Okl., 519 P.2d 491 (1974).

*Silk v. Phillips Petroleum Co.*, 1988 OK 93, 760 P.2d 174, 176-77. As shown in the Verified Factual

Statement of Plaintiffs, Section I, the Defendants' misrepresentation was that after the settlement

16

with Centre Lane there would be a payoff or takeout of the Wells Debt on (or before) July 31, 2012, which did not occur. There is no direct evidence of the second element, that Defendants knew or intended on July 25, 2012 that the statement was false, when first made, but the representation was renewed by direct statements of Blaige in Exhibits 16, 19, and 35, and by Blaige and Wilkins speaking concerning the takeout of the Wells Debt and not contradicting the express understanding of Plaintiffs in Exhibits 10, 11, 12-13, 17, 21, 22, 27, and 37. There is direct evidence in Exhibit 14 that on July 28, 2012 at 1:51 p.m. that Blaige had spoken to Unger and communicated with von Hugo on the plan not to takeout the Wells Debt, but instead to seek an extension, and to mislead Dickman. Thereafter, Blaige emailed Dickman in Exhibit 16, 19, and 35, but Plaintiffs continued to be misled.

Moreover, Defendants cannot shield their fraud by slight of hand, or misapprehension by Plaintiffs. In *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1353 (Ok. 1988), the Oklahoma Supreme Court quoted with approval the following language:

> . . . although one may not be under a duty to speak, if he undertakes to do so he must speak the truth and not suppress the facts within his knowledge or materially qualify those stated. The duty to speak arose when defendant began negotiations; on disclosing in part the pertinent facts, such duty would be breached by withholding other pertinent facts. A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impressing by the disclosure of some facts and the concealment of other is guilty of fraud even though his statement is true as far as it goes, since concealment is in effect a false representation that what is disclosed is the whole truth.

Further, the court continued:

> Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth.

*Id.*, at 1353-1354. This is the exact circumstance that pertains in this case, where Defendants' counsel, Wilkins, participated in drafting the Centre Lane Settlement Agreement and General

Release, and Promissory Note to give them effect, and the Plaintiffs were led to execute the documents in the belief the Wells Debt would be taken out (purchased). Exhibits 8, 14, 15, 16, 18, 19, 22, 23, 24, 25, 27-33, 35, 36, 39, 40, 46, 37, and 48.

Picking up with the necessary elements under *Silk*, it cannot be disputed that Defendants made the misrepresentation with the intention that it be acted upon as shown by their desire and repeated efforts to secure the Settlement Agreement and Release from Centre Lane, and the execution of the Promissory Note. *Id.* Likewise, there is no question on reliance given the execution of the Centre Lane documents by the Plaintiff parties. The occasion of detriment is also undisputed, because of the fire sale liquidation of Oracle. Dickman Affidavit, ¶ 3, Amended Complaint, ¶ 56.

The application of the crime fraud exception is appropriate here under Tenth Circuit law as shown in *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998), where the court stated:

> To invoke the crime-fraud exception, the party opposing the privilege must present prima facie evidence that the allegation of attorney participation in the crime or fraud has some foundation in fact. *Motley*, 71 F.3d at 1551; *In re Grand Jury Proceedings (Vargas)*, 723 F.2d at 1467. The evidence must show that the client was engaged in or was planning the criminal or fraudulent conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it. *See In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987). The exception does not apply if the assistance is sought only to disclose past wrongdoing, *see Zolin*, 491 U.S. at 562, 109 S.Ct. 2619, but does apply if the assistance was used to cover up and perpetuate the crime or fraud. *See In re Grand Jury Proceedings (Doe)*, 102 F.3d 748, 749-51 (4th Cir. 1996) (applying exception where client used lawyers, without their knowledge, to misrepresent or to conceal what the client had already done); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (noting that exception applies where "communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity").

As shown in the Verified Factual Statement of Plaintiffs, the fraudulent scheme was a fact if not on July 25, 2012, then when von Hugo expressed to Blaige with a copy to Unger in Exhibit 14 on July 28, 2012:

Its highly important that we not get the letter from CL.

Thereafter, Wilkins of Freshfields was intensely involved in monitoring and approving the Settlement Agreement and Release and crafting the Promissory Note that gave viability to the entirety of the Centre Lane Settlement Agreement and Release, Exhibits 14, 15, 18, 23, 24, 25, 27-33, 36, 39, 40, 46, 37, and 48, and Freshfields then acted on the letter to go to Wells that sought an extension of 45 days. Exhibit 43. The Defendants unquestionably used Freshfields to further their fraudulent scheme.

## III. ALL REDACTIONS THAT IN ANY WAY MAKE REFERENCE TO OEP, ONE EQUITY PARTNERS (EUROPE), OR ONE EQUITY PARTNERS LLC, OR CLAIMS OF PRIVILEGE RELATED THERETO, ARE ALSO SUBJECT TO THE CRIME FRAUD EXCEPTION.

Plaintiffs have alleged that Defendants acted jointly, *i.e.*, through a conspiracy. The illegal object of the conspiracy was to commit a fraud, a *prima facie* case for which is shown in Section II, above. At this time Plaintiffs do not know the substance of redactions that may have been effected by Freshfields or the Defendants, but they do know that within the privilege log for One Equity Partners LLC, there has been a claim of privilege asserted with regard to Judah Schechter, Esq., as shown in Exhibit 3. Mr. Schechter is Vice President and Secretary of One Equity Partners LLC. Exhibit 56. The Court at the least should undertake an *in camera* review of those documents as well as others submitted with the Motion as it is believed that Mr. Schechter was not rendering legal advice, but was, rather, a third-party participant in business discussion. In addition, the crime fraud exception should relieve the privilege claim for all documents of One Equity Partners LLC on its privilege log.

## CONCLUSION

Justice warrants the invocation of the crime fraud exception on behalf of the Plaintiffs.

s/ Laurence L. Pinkerton

Laurence L. Pinkerton, Esq. (OBA #7168)
PINKERTON LAW, P.C.
Penthouse Suite
15 E. 5th Street
Tulsa, Oklahoma 74103-4303
(918) 587-1800
(918) 582-2900 fax
pf@att.net
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2015, I electronically transmitted the foregoing pleading, to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

John D. Russell, Esq.
GABLEGOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, Oklahoma 74103-4217

Cheryl Howard, Esq.
Aaron Lang, Esq.
Marshall Fishman, Esq.
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022

s/ Laurence L. Pinkerton