**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| PINNACLE PACKAGING | ) | |
| COMPANY, INC., | ) | |
| an Oklahoma corporation, | ) | |
| POLO ROAD LEASING, LLC, | ) | |
| an Oklahoma limited liability company, | ) | |
| and | ) | |
| J. SCOTT DICKMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 12-CV-537-JED-TLW |
| | ) | |
| vs. | ) | |
| | ) | |
| CONSTANTIA FLEXIBLES GmbH, | ) | |
| an Austrian corporation, and | ) | |
| ONE EQUITY PARTNERS (EUROPE) | ) | |
| GmbH, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court is Plaintiff's Motion to Apply Crime Fraud Exception to Claims of Privilege by Defendants and for Other Relief on Claims of Privilege. (Dkt. 135). Plaintiffs contend that defendant made fraudulent misrepresentations during negotiations to purchase plaintiff Pinnacle Packaging and that defendants used their legal counsel to perpetuate that fraud. (Dkt. 137). Plaintiffs argue that the Court should apply the crime fraud exception to every email in the three privilege logs attached as Exhibits 1, 2, and 3 of their motion, but plaintiffs focus their argument on their request for an *in camera* review of a smaller collection of emails, listed as Exhibits 4-6 and 18, 20, 23, 25, 26, and 34 to their motion. (Dkt. 135, 138).

# FACTUAL BACKGROUND[1]

This case arises from a failed business deal. Plaintiff Pinnacle is the sole shareholder of Oracle, a flexible packaging company. The remaining plaintiffs own stock in Pinnacle, and plaintiff Dickman was the majority shareholder and CEO. Plaintiffs describe Oracle as "very well positioned in the U.S. flexible packaging manufacturing industry" but admit that "it was undergoing substantial liquidity problems due to business and general economic circumstances beyond its control that began in October, 2011." (Dkt. 89, ¶ 10).

In March 2012, plaintiffs entered into an agreement with a third party, Centre Lane, to purchase Oracle. This agreement included an exclusivity provision that prevented plaintiffs from attempting to negotiate a sale with any third parties. In May 2012, Centre Lane sued plaintiffs, alleging that they had breached the exclusivity provision. At that time, Constantia's representatives contacted Dickman to inquire about purchasing or entering into a joint venture with Oracle. Plaintiffs met with defendants but continued to work toward a settlement with Centre Lane, with the intent that Centre Lane would purchase Oracle. Plaintiffs allege that the timing of the sale of Oracle was critical because Wells Fargo, which had loaned Oracle funds through Credit and Security Agreements since 2010, had recently declared Oracle in breach of those agreements. Wells Fargo demanded that the loan be repaid in full through a sale or refinancing by July 31, 2012.

Defendants and plaintiffs began efforts to negotiate a purchase of Oracle by Constantia. Plaintiffs allege that defendants agreed to loan plaintiffs the money to settle its lawsuit with Centre Lane, thereby ending negotiations for Centre Lane to purchase Oracle. Plaintiffs also

---

[1] The information in this section is taken from plaintiffs' Second Amended Complaint. (Dkt. 89).

allege that defendants agreed to pay off the Wells Fargo debt so that plaintiffs could avoid defaulting on the loan.

Defendants loaned plaintiffs the money to effectuate the settlement with Centre Lane, but the July 31, 2012 deadline passed without satisfaction of the debt to Wells Fargo. Wells Fargo froze Oracle's credit account, forcing Oracle into a position where it could not fund its day-to-day operations. Thereafter, the deal with defendants fell through, and plaintiffs were "forced" to sell Oracle to Centre Lane quickly and at a much lower price than plaintiffs had originally negotiated. This lawsuit followed.

## PLAINTIFFS' MOTION

The privileged documents sought by plaintiffs fall into three different subject areas: (1) those related to the Settlement Agreement and General Release between Centre Lane and plaintiffs, including the promissory note that plaintiffs signed with defendants to secure that settlement; (2) those related to plaintiffs' Wells Fargo debt[2] and defendants' discussions either to pay-off or to extend that debt as part of a plan to purchase Oracle; and (3) those related to the role that One Equity Partners (Europe) or One Equity Partners LLC played in negotiating with plaintiffs in 2012. Id. Plaintiffs seek discovery of all emails identified in the privilege logs from Thomas Blaige, Freshfields Bruckhaus Deringer US LLP, and One Equity Partners LLC but specifically request an *in camera* review of nine email strings, identified as Exhibits 4-6 and 18, 20, 23, 25, 26, and 34 to plaintiffs' motion, and all the emails identified in the privilege log submitted by One Equity Partners LLC. Id.; (Dkt. 138).

Relevant to plaintiffs' motion are the following alleged misrepresentations and omissions:

---

[2] The Wells Fargo debt belonged to Oracle (wholly owned by Pinnacle) and was personally guaranteed by Dickman. Polo Road owned Pinnacle.

(1)     von Hugo misrepresented to Dickman that "we" will either move forward with the purchase of the Wells Fargo debt or tell Dickman that they cannot. (Dkt. 137 at 6).

(2)     One Equity Partners (Europe) and/or One Equity Partners LLC misrepresented that they were participants in the negotiations with Constantia to purchase Oracle. (Dkt. 137). One Equity Partners LLC is no longer a party to this lawsuit.[3]

(3)     During a July 25, 2012, telephone call, defendants promised to lend plaintiffs up to $6 million to settle with Centre Lane, but they also misrepresented that plaintiffs could keep half of the difference between the $6 million and any actual settlement figure. Id.

(4)     During the July 25, 2012, telephone call, defendants misrepresented that, following the settlement with Centre Lane, defendants would "buy out" plaintiffs' loan with Wells Fargo at par while defendants conducted due diligence regarding the purchase of Oracle. Id. Defendants also misrepresented that they would assume the Wells Fargo debt in the event that they did not purchase Oracle and give plaintiffs six months to place the debt with another financial institution. Id.

(5)     Instead of purchasing the loan, however, defendants omitted to tell plaintiffs that they intended to approach Wells Fargo on July 31, 2012 – the day the loan was due in full – with a plan to pay a $1 million fee and provide Wells Fargo with other benefits to obtain an extension of the loan for forty-five days. Id.

Plaintiffs argue that defendants used their law firm, Freshfields, and one of its attorneys, Tim Wilkins, to perpetuate their alleged fraud by having Wilkins assist in drafting the settlement agreement with Centre Lane. Id. Plaintiffs also argue that Wilkins communicated with plaintiff Dickman directly about the Wells Fargo loan and that those communications were intended to mislead plaintiffs regarding defendants' "scheme" not to pay off the loan. Id. Additionally,

---

[3] One Equity Partners LLC was named as a defendant in the Complaint and then dismissed for a lack of personal jurisdiction. (Dkts. 2, 84). One Equity Partners (Europe) remains a defendant. In their motion, plaintiffs imply that One Equity Partners LLC participated in the negotiations to purchase Pinnacle Packaging.

plaintiffs cite a number of emails between the parties, in which Wilkins was copied but did not respond, furthering a "conspiracy" among defendants to mislead plaintiffs. Id.

Defendants argue generally that Oklahoma's crime-fraud exception is an "exceptional" remedy applicable only in limited circumstances, as evidenced by the limited number of cases in which it has been applied. (Dkt. 144). Defendants also argue that Oklahoma's crime-fraud exception statute does not apply to civil cases. Id. With respect to the application of the privilege to this case, defendants contend that plaintiffs have failed to present a *prima facie* showing of the elements of fraud or that any of the attorney-client privileged communications were intended "to promote or conceal the alleged fraud." Id. at 18.

Plaintiffs have submitted the three privilege logs at issue, as well as a mix of discovery and affidavits to support their claim that defendants and their counsel perpetrated a fraud, thus triggering the crime fraud exception.

## ANALYSIS

Federal Rule of Evidence 501 states that, "[i]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Oklahoma provides the rule of decision here, and Oklahoma's attorney-client privilege statute allows a client,

> to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:
>
> 1. Between the client or a representative of the client and the client's attorney or a representative of the attorney;
>
> 2. Between the attorney and a representative of the attorney;
>
> 3. By the client or a representative of the client or the client's attorney or a representative of the attorney to an attorney or representative of an attorney

representing another party in a pending action and concerning a matter of common interest therein;

4. Between representatives of the client or between the client and a representative of the client; or

5. Among attorneys and their representatives representing the same client.

Okla. Stat. tit. 12, § 2502(B). The privilege does have limited exceptions, including a crime-fraud exception, which waives the privilege "[i]f the services of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." Id. at § 2502(D)(1).

### Application of the Oklahoma Crime-Fraud Exception to Civil Cases

Defendants argue that the crime-fraud exception has never been applied to a case involving civil fraud. (Dkt. 144 at 17). Defendants further contend that even in civil cases, the exception has been applied only to criminal behavior, citing White v. American Airlines, Inc., 915 F.2d 1414 (10th Cir. 1990), a wrongful termination case in which the plaintiff alleged that the defendant's attorney, at the behest of the defendant, asked plaintiff to perjure himself in a deposition. See White, 915 F.2d at 1417-18. (Dkt. 144 at 17).

Notwithstanding defendants' contention, the Tenth Circuit has interpreted Oklahoma's crime-fraud exception to apply to both crime and civil fraud. See Motley v. Marathon Oil Co., 71 F.3d 1547, 1551 (10th Cir. 1995) (declining to extend the exception to torts but acknowledging the exception as applicable to either crime or fraud). A plain reading of the statute is consistent with the Tenth Circuit's interpretation. The statute specifically refers to "a crime or fraud." Okla. Stat. tit. 12, § 2502(D)(1) (emphasis added). The word "or" is disjunctive and "unless the context or [legislative] intent [of a statute] indicates otherwise, the use of a disjunctive in a statute and regulations indicates that alternatives were intended." Knutzen v. Eben Ezer Lutheran Housing

6

Ctr., 815 F.2d 1343, 1349 (10th Cir. 1987) (citations omitted). As the Supreme Court has held, "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Because the term "crime" would encompass all criminal activity, including criminal fraud, the term "fraud" must refer to civil fraud. Therefore, the Court finds that the crime-fraud exception does apply to civil fraud.

**Prima Facie Evidence**

Before the Court may conduct an *in camera* review of privileged documents to determine whether the crime-fraud exception applies, plaintiffs "must present prima facie evidence that the allegation of attorney participation in the crime has some foundation in fact." In re Grand Jury Subpoenas, 144 F.3d 653, 660 (10th Cir. 1998). The "exact quantum" of evidence necessary to establish a *prima facie* case is not well-defined. Id. The Supreme Court has held only that

> [b]efore engaging in *in camera* review to determine the applicability of the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' Caldwell v. District Court, 644 P.2d 26, 33 (Colo. 1982), that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

United States v. Zolin, 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The decision to conduct an *in camera* review "rests in the sound discretion of the district court." Id.

The Court notes two cases in which a reviewing court addressed the burden to establish a *prima facie* case, with differing results. In White v. American Airlines, Inc., the Tenth Circuit found that the plaintiff established a *prima facie* case to support application of the crime-fraud exception. See 915 F.2d at 1424. Plaintiff testified that defendant's counsel asked him repeatedly to commit perjury during a deposition and presented additional evidence that defendant's counsel met with a vice-president of the defendant corporation "just prior to making a number of these

requests." Id. However, in Cooper v. State, 671 P.2d 1168 (Okla. Crim. App. 1983), the Oklahoma Court of Criminal Appeals declined to apply the crime-fraud exception in a case where the only evidence was the defendant's own testimony. Id. at 1172. Accordingly, something other than plaintiff Dickman's testimony is necessary to establish a *prima facie* case of fraud for the purpose of conducting an *in camera* review.

**Elements of Fraud**

Oklahoma law defines the elements of fraud as follows: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment." Bowman v. Presley, 212 P.3d 1210, 1218 (Okla. 2009). "Silence may constitute a misrepresentation sufficient to support a claim of fraud only where there is a failure to disclose a material fact by one having a duty to disclose and who remained silent to that party's benefit and to the detriment of the other party." Clinesmith v. Harrell, 992 P.2d 926, 928 (Okla. Civ. App. 1999) (citing Silk v. Phillips Petroleum Co., 760 P.2d 174 (Okla. 1988)). In cases where a party has no duty to speak, "if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth." Uptegraft v. Dome Petroleum Corp., 764 P.2d 1350, 1353-54 (Okla. 1988).

In this case, plaintiffs assert that defendants participated in fraud and included attorney Wilkins in that fraud both by making positive assertions intended to mislead plaintiffs, by failing to disclose the whole truth regarding their negotiations with plaintiffs, and by remaining silent when they had a duty to speak. (Dkt. 137). Plaintiffs do not explain defendants' duty to speak but do imply that attorney Wilkins had a professional, "legal" duty. Id. at 9, 17. Plaintiffs frame their

argument as a "scheme" or "conspiracy," in which defendants encouraged plaintiffs to settle with Centre Lane in order to make plaintiffs wholly dependent on defendants with respect to the negotiations for the purchase of Pinnacle Packaging. Id. at 10-19. Defendants argue that plaintiffs cannot establish *prima facie* evidence of all the required elements of fraud; therefore, the crime-fraud exception does not apply. (Dkt. 144).

**Plaintiffs' Evidence of Fraud**

Plaintiffs allege that defendants made five separate misrepresentations or omissions: (1) that von Hugo told Dickman that "we" will either move forward with the purchase of the Wells Fargo debt or tell him that they could not; (2) that One Equity Partners, LLC and One Equity Europe were parties to the negotiations to purchase Pinnacle Packaging; (3) that plaintiffs had the authority to negotiate up to $6 million to settle with Centre Lane and could keep half of the difference between the $6 million authorized and the actual settlement; (4) that defendants would pay off the Wells Fargo debt on or before it was due in full on July 31, 2012; and (5) that instead of paying the Wells Fargo loan as represented, defendants offered $1 million and other consideration to extend the loan for forty-five days without informing plaintiffs of this offer.

**One Equity Partners LLC/One Equity Partners (Europe)**

In their First Amended Complaint, plaintiffs named One Equity Partners LLC as a defendant. (Dkt. 30). Plaintiffs alleged that "One Equity Partners" held itself out as a single LLC, thereby encompassing One Equity Partners (Europe). Id. Plaintiffs further alleged that Christopher von Hugo, a managing director of "One Equity Partners," negotiated with plaintiffs to purchase Pinnacle Packaging/Oracle. Id. In the description of the parties, plaintiffs stated that they believed One Equity Partners LLC owned One Equity Partners (Europe), but "[i]n the event the Court should find that there is no jurisdiction over One Equity Partners LLC, then in the

alternative, von Hugo was acting as an agent of One Equity Partners (Europe). Id. One Equity Partners LLC moved to dismiss, citing a lack of personal jurisdiction. (Dkt. 53). The District Court found that von Hugo was not affiliated with One Equity Partners LLC and dismissed it for lack of personal jurisdiction.

Nonetheless, plaintiffs continue to argue that they "believe" von Hugo represented One Equity Partners, LLC. (Dkt. 137). In support, they cite to One Equity Partners LLC's privilege log (dkt. 135-1, Ex. 3), in which Schecter asserts attorney-client privilege with respect to documents related to the negotiations. Plaintiffs argue that Schecter was participating in the discussions, not as an attorney, but as a "third-party participant in business discussion" and request in camera review of all those documents. (Dkt. 137). Plaintiffs also argue, without any analysis, that the crime-fraud exception would also apply to all of the documents in One Equity Partners LLC's privilege log. Id.

The privilege log from One Equity Partners LLC describes a series of emails dated July 24, 2012 through August 3, 2012, which contain requests for legal advice on such issues as "a potential loan in connection with the potential acquisition of Oracle," "the potential acquisition of Oracle," the "Pinnacle settlement with Centre Lane," and "the potential Oracle deal structure." (Dkt. 135-1, Ex. 3). Many of the emails involve only Schechter and attorneys from Freshfields, but some emails include Unger, von Hugo, Blaige, and Kelsey, all of whom were involved with the negotiations to purchase Pinnacle Packaging/Oracle. However, nothing in the privilege log suggests that One Equity Partners LLC, through Schechter, was involved in the actual negotiations. The record does not explicitly define the exact relationship between One Equity Partners LLC and One Equity Partners (Europe), but in defendants' response, they identify One

Equity Partners LLC as "an indirect affiliate of Defendants [] not involved in the events at issue here." (Dkt. 144).

While plaintiffs' theory is one interpretation of the privilege log, it is also possible that One Equity Partners (Europe) reached out to its "indirect affiliate" in America for legal advice pertaining to the purchase of an American company. Accordingly, plaintiff's theory, supported only by the notations in the privilege log, does not create a *prima facie* case that defendants misrepresented One Equity Partners LLC's lack of involvement in the negotiations or that it participated in any "scheme" or "conspiracy."

Plaintiffs also argue that von Hugo held himself out as a representative of One Equity Partners (Europe), but the corporation now claims that it played no role in the negotiations, as evidenced by its interrogatory responses. (Dkt. 138, Ex. 51-52). The interrogatory responses from both Contantia and One Equity Partners (Europe) state that von Hugo was a managing director for One Equity Partners (Europe) and that, as a result of his position with One Equity Partners (Europe), von Hugo also held a position as Vice Chairman of the Supervisory Board of Constantia, which was owned by One Equity Partners (Europe). Id. Plaintiffs cite two pieces of evidence to support their contention that von Hugo represented One Equity Partners (Europe). First, in a May 25, 2012, email, Jan Homan with Constantia identified von Hugo as "Management Partner of OEP (the Private Equity Fund of JP Morgan)." (Dkt. 137).[4] Second, plaintiffs contend that in a July 13, 2012, meeting, both Blaige, Constantia's agent, and Kelsey,

---

[4] Plaintiffs do not identify this email as an exhibit to their motion.

Constantia's Merger and Acquisition Manager, referenced One Equity Partners generally in their verbal presentation to plaintiffs.[5] Id.

Plaintiffs do not explain how these alleged misrepresentations fall under the crime-fraud exception to the attorney-client privilege, nor do they explain how accessing privileged documents would support their claims of fraud. Plaintiffs do not allege that any attorneys from Freshfields were involved in any alleged misrepresentations regarding von Hugo's agency during the negotiations. The Court need not reach that analysis, however, because the Court finds, for the purpose of this motion only, that the overwhelming evidence throughout the record supports a finding that plaintiffs were negotiating with Constantia. Other than von Hugo, who held positions with both Constantia and One Equity Partners (Europe), plaintiffs admit that all other representatives involved in the negotiations were affiliated with Constantia. Id. See also (Dkt. 138, Ex. 7). Additionally, when plaintiffs settled with Centre Lane, it was Constantia who provided the funds, and plaintiffs entered into a promissory note with Constantia. (Dkt. 138, Ex. 29). Accordingly, plaintiffs have not made a *prima facie* case that the crime-fraud exception should apply to documents listed on the privilege log of One Equity Partners LLC.

**Centre Lane Settlement and Incentive Money**

Plaintiffs contend that defendants agreed to loan plaintiffs up to $6 million to settle with Centre Lane. (Dkt. 137). As an incentive to negotiate a lower settlement, plaintiffs also contend that defendants promised plaintiffs they could keep half of the difference between the settlement and the $6 million. Id. The only evidence to support these allegations is Dickman's statement

---

[5] Although plaintiffs quote Blaige and Kelsey, plaintiffs again do not identify an exhibit containing these quotes.

that defendants made this representation during a July 25, 2012, telephone call.[6] (Dkt. 138-3 at Ex. 55). Unlike the issue of the pay-off for Wells Fargo, which Dickman mentions in multiple emails, there is no evidence that plaintiffs raised the issue of the incentive money during the drafting of the settlement agreement and the arrangements for payment to Centre Lane. Plaintiffs' statements alone are insufficient to establish *prima facie* evidence that defendants made such a misrepresentation or that defendants involved counsel in that alleged misrepresentation. See Cooper, 671 P.2d at 1172.

**The Wells Fargo Debt**

Plaintiffs allege that during the July 25, 2012, telephone call, defendants also agreed to pay off the Wells Fargo debt by July 31, 2012, in order to avoid a default by Oracle. (Dkt. 137). Plaintiffs allege that defendants agreed to pay off the loan with the understanding that the pay-off would give defendants time to conduct due diligence on the purchase of Pinnacle Packaging/Oracle and, if the purchase fell through, plaintiffs would have a set period of time to place that debt with a new financial institution. Id. Plaintiffs contend that the promise of a pay-off was a misrepresentation. Id. Defendants argue that plaintiffs can present no proof that defendants promised to refinance the Wells Fargo debt and that the discovery process has uncovered evidence that no such promise was made. (Dkt. 144). Defendants argue that the July 30, 2012, term sheet, the lack of existing documentation for the pay-off versus the documentation for the Centre Lane settlement loan, and Dickman's "support" for defendants'

---

[6] This telephone call remains a point of controversy. Dickman routinely recorded his telephone calls with defendants, but he claims not to have recorded this call because he took the call on a headset, so his recording device would have picked up only his voice. (Dkt. 155-1). Defendants contend that Dickman illegally recorded these calls because he failed to obtain the consent of the other parties on the line; however, they point to Dickman's failure to record this telephone call as proof that defendants did not make the promises that Dickman alleges. (Dkt. 144). The Court need not address the admissibility of the recordings or make findings regarding the absence of a recording for the July 25, 2012 telephone call in order to resolve this motion.

efforts after the July 31, 2012, deadline demonstrate that no promise was made. Id. Defendants also argue that Dickman made several "critical admissions" in his deposition that weigh against a finding that defendants agreed to pay off the Wells Fargo debt as plaintiffs now claim. Id. at 2, n.2.

Plaintiffs have submitted a series of emails and other documents to support their position. (Dkt. 138). The emails demonstrate that in the days following the July 25, 2012, telephone call, plaintiffs negotiated a settlement with Centre Lane with the assistance of defendants and their counsel. Id. In the days between that telephone call and the deadline for the Wells Fargo debt, Dickman consistently raised the issue of the pay-off with defendants, asking about strategy for approaching Wells Fargo and requesting written confirmation that the loan would be paid. (Dkt. 138, Ex. 10, 11, 12, 17, 19, 21, 22, 26, 35, 42). Defendants either deflected Dickman's questions or ignored them. Id.

Additionally, plaintiffs have submitted several emails circulated among defendants that indicate defendants did not intend to pay off the Wells Fargo debt on July 31, 2012. (Dkt. 138, Ex. 15, 16, 25). For example, on July 28, 2012, three days after defendants allegedly promised to pay off the Wells Fargo debt, Blaige emailed von Hugo and Unger regarding plans for the Centre Lane release and Wells Fargo debt. In that email, Blaige states,

> I spoke with Thomas [Unger] about getting the CL release first and then getting in touch with wells [sic] Fargo to discuss buying up to two weeks to sign agreement with Scott [Dickman], verify figures and sort out the mill situation. I would initially just tell Scott [Dickman] we want to discuss the payoff directly with wells [sic] Fargo ASAP today or tomorrow.

(Dkt. 138, Ex. 15). This email indicates that as of 3:25 PM on July 28, 2012, defendants' strategy was to approach Wells Fargo and request additional time on the loan and to make this request without informing Dickman. Id. However, earlier that day, Blaige emailed Dickman to ask

14

whether the Wells Fargo debt "can wait a bit," and Dickman answered, "No. All of the Wells Fargo revolver and term loan and Centre Lane need to be paid on Tuesday." (Dkt. 138, Ex. 16). Blaige responded at 5:04 P.M. with this comment: "Ok I don't think we have a current schedule of each loan and balance due." Id. A fact finder could reasonably infer from these emails that Blaige, the agent for One Equity Partners (Europe), was leading Dickman to believe that the Wells Fargo debt would be paid, even though the strategy was to avoid payment of the debt. (Dkt. 138, Ex. 15 and 16).

A fact finder could also infer that defendants' plan to request additional time from Wells Fargo continued through July 30, 2012, the day before the loan was due. (Dkt. 138, Ex. 25). In an email to defendants' representatives at 5:28 P.M., Richard Kelsey at Constantia sent a brief update of the status of the purchase, stating that after the Centre Lane settlement was finalized, the "[n]ext step will then to be to approach banks, Wells Fargo, with view to getting time (at this stage to be defined) to carry out due diligence." Id. Meanwhile, earlier that afternoon, Dickman had emailed attorney Wilkins twice, first stating that he "will need to insure that Constantia will be in a position to make the payment to Wells and Centre Lane tomorrow" (dkt. 138, Ex. 26) and then that "we need to arrange to secure the loan documents so that payments can be made tomorrow in time for the Wells deadline" (dkt. 138, Ex. 27). Wilkins responded that he was "[w]aiting on instructions from client" and was on a call with defendants. (Dkt. 138, Ex. 28).

Plaintiffs did ultimately receive, on July 30, 2012, a draft of the promissory note from defendants that would secure the payment to Centre Lane. (Dkt. 138, Ex. 29). However, similar documentation for the Wells Fargo debt was not sent, and at 10:39 P.M., Dickman emailed von Hugo, attorney Wilkins, Unger, Blaige, and Kelsey again to request the loan documents. (Dkt. 138, Ex. 34). Dickman wrote that "the Wells team is very suspect of this situation because it is

15

unprecedented that we can not [sic] produce any documentation to support the fact we are going to pay them off by 2:00 pm Central time tomorrow as well as Centre Lane" and asked again to see the loan agreements. Id. Attorney Wilkins responded approximately thirty minutes later that the Centre Lane agreement had to be finalized before defendants could speak with Wells Fargo but that defendants had scheduled a conference call with them for the following morning. Id. At approximately the same time Dickman emailed Blaige to ask if the Wells Fargo loan documents were being withheld from him until after defendants spoke with Wells Fargo. (Dkt. 138, Ex. 37). Blaige responded that von Hugo and Unger "want to work in sequence." Id. Dickman replied that the telephone call with Wells Fargo was a "new condition" to him and implied that the telephone call should not prevent him from reviewing the proposed loan documents. Id.

In the early morning hours of July 31, 2012, von Hugo emailed Blaige, Unger, and an attorney from Freshfields, Arend von Reigen, with information regarding the upcoming call with Wells Fargo. (Dkt. 138, Ex. 42). Von Hugo stated that plaintiffs were not to be included in the telephone call with Wells Fargo and laid out a strategy for convincing Wells Fargo to extend the loan in exchange for the offer of future business with Constantia. Id. Constantia sent that offer to Wells Fargo just three hours before the loan was due. (Dkt. 138, Ex. 44). It contains no mention of a pay-off. Id. Wells Fargo rejected the offer, and nothing in the record before the Court indicates that defendants attempted further negotiations or offered to refinance the debt.

Defendants contend that there is no evidence of a *prima facie* case for fraud and focus much of their argument on refuting plaintiffs' claims. (Dkt. 144). However, defendants do proffer some evidence that they never made a promise to pay off the Wells Fargo debt. Id. First, defendants point to the fact that Dickman, who was in the habit of recording all telephone calls, did not record the July 25, 2012, telephone call in which defendants allegedly promised to pay

the Wells Fargo debt. (Dkt. 144 at 9). Defendants also cite Dickman's habit of taking notes of all telephone calls; however, his notes from that day do not mention the Wells Fargo debt, and Dickman testified in his deposition that his notes contain only a reference to sending "debt documents" to attorney Wilkins. (Dkts. 144-2; 144-3 at 222-23).

Second, defendants cite to the term sheet dated July 30, 2012, outlining the plan for Constantia's purchase of Pinnacle Packaging. (Dkt. 144-2). The price terms include "$16.5 million to refinance Wells Fargo credit facility," but the term sheet also states that, with respect to the Wells Fargo debt, "Buyer will initiate discussions directly with Wells Fargo in relation to the Wells Fargo Credit Facility." Id. Nothing in the term sheet specifies that defendants intended to pay the Wells Fargo debt by July 31, 2012. Id.

Dickman did not respond to the term sheet until August 2, 2012. Id. In that response, he stated that "[w]e also had prepared Wells for a pay off on Tuesday which as you know did not happen. I am personally guaranteed on all of that debt and it was made very clear to me that Wells was going to do everything possible to place us into Chapter 11. I did not worry much because of our conversations but it did get the attention of a lot of people that would be impacted if the worst did happen." Id. (errors in original). Dickman goes on to explain the impact of the failure to pay that loan, which included returned checks for more than $100,000.00 total and cites "[t]he urgency of the situation." Id.

Defendants argue that this response, along with Dickman's contemporaneous response to Wells' refusal to extend the loan, demonstrate that no promise of pay-off was made. (Dkt. 144). Defendants cite to Dickman's emails on July 31, 2012. (Dkt. 144-5). Dickman sent a group email shortly after Wells Fargo refused to extend the loan, expressing disappointment and a lack of understanding at Wells Fargo's refusal. Id. Dickman did state that he believed paying the loan

17

was the only option and he implied that defendants should make the pay-off, but he also referenced another option – a proposal from Bank of America that would take forty-five days to close. Id. In a subsequent email to von Hugo, Dickman referenced Constantia's "generous waiver fee offer" and requested a telephone call with von Hugo to "discuss next steps." Id. Von Hugo's response expresses surprise that Wells Fargo had refused the offer and states that Wells Fargo's refusal to take $1 million in exchange for an extension of time raised questions about "hidden risks" at Pinnacle Packaging. Id. Defendants argue that this response is not consistent with a broken promise to pay off the entire Wells Fargo debt. (Dkt. 144). Plaintiffs contend that they were desperate when the loan became due and that Dickman was forced to play along in order to salvage a deal. (Dkt. 155).

Having reviewed the evidence submitted by both sides, the Court finds that for purposes of the crime-fraud exception, plaintiffs have made a *prima facie* case for fraud, but only with respect to the events surrounding the Wells Fargo debt. Dickman has not provided direct proof that defendants agreed to pay off the Wells Fargo debt, but at least some of his actions are consistent with his assertion that defendants did, in fact, make that promise and a fact finder could reasonably reach this conclusion. Likewise, a fact finder could reach the conclusion that defendants' actions show a pattern of deflecting Dickman's questions regarding the Wells Fargo debt or delaying responses. Additionally, at least one email from Blaige to Hugo, Unger, and Kelsey could evidence a plan to conceal Constantia's strategy, as alleged by plaintiffs, regarding the Wells Fargo debt from plaintiffs. (Dkt. 138-1, Ex. 15). If a fact finder were to reach these conclusions, the further conclusion that plaintiffs relied, to their detriment, on the alleged misrepresentations logically follows.

Each of the emails identified by plaintiffs in exhibits four through six, eighteen, twenty, twenty-three, twenty-five, and twenty-six of the additional attachment in support of their motion appears to relate to the Wells Fargo debt. <u>See</u> (Dkt. 138 at Ex. 4-6, 18, 20, 23, 25, 26). Thus, these emails shall be submitted to the Court for an *in camera* review.

## CONCLUSION

For the reasons set forth in this order, the Court GRANTS IN PART the Motion of Plaintiffs to Apply Crime Fraud Exception to Claims of Privilege by Defendants. (Dkt. 135). The Court will conduct an *in camera* review of the following documents: Dkt. 138, Exhibits 4, 5, 6, 18, 20, 23, 25, 26, and 34. Defendants are ordered to produce the unredacted versions of those documents in chambers on or before February 15, 2016. The Court reserves ruling on plaintiffs' request that the Court apply the crime-fraud exception to all of defendants' emails until after the Court's review.

SO ORDERED this 10th day of February, 2016.

_____

T. Lane Wilson
United States Magistrate Judge